STATE OF NORTH CAROLINA v. WILLIAM EDWARD HAMLETTE

No. 3

(Filed 7 April 1981)

1. Criminal Law § 73.4— victim's statements to police — admissiblity as res gestae

   In a first degree murder prosecution the trial court did not err in permitting two police officers to relate the victim's statements made to them within three to thirteen minutes of the shooting since the victim, when he made the statements, was suffering from three gunshot wounds, was bleeding from the mouth and chest, was at the crime scene, and at the time of the second statement was being prepared by ambulance attendants for the trip to the hospital; such circumstances supported the trustworthiness of the statements made while the victim was under the immediate influence of the act; and the statements did not in any way

State v. Hamlette

lose their spontaneous character because they were in response to questions such as: "What is wrong?" "Who shot you?" "How did they leave?"

### 2. Homicide § 16— dying declarations — requirements for admissiblity

Dying declarations by the person whose death is at issue are admissible in N. C. provided that, at the time they were made, the declarant was in actual danger of death; he had full apprehension of the danger; death did in fact ensue; and defendant, if living, would be a competent witness to testify to the matter. G.S. 8-51.1.

### 3. Homicide § 16.1— dying declarations — declarant's full apprehension of his danger

In a prosecution of defendant for first degree murder, the trial court properly admitted testimony by a police officer about a communication to him by the homicide victim approximately thirty minutes after the shooting at a time when doctors had just finished hooking the victim up to a blood transfusion in preparation for surgery for the gunshot wounds, and properly excluded as a dying declaration a statement made by the victim to a girlfriend four days after the shooting at a time when the circumstances did not indicate that death was obviously imminent and there was no indication that the victim believed he was near death; furthermore, it was impossible for the court on appeal to determine if statements made to another of the victim's girlfriends were dying declarations.

### 4. Criminal Law § 35— offense committed by another — evidence improperly excluded

In a prosecution for first degree murder where defendant contended that it was not he but one of the State's witnesses who shot deceased, the trial court erred in excluding evidence which pointed directly to the witness as the guilty party, including evidence that the witness was also arrested and charged with the shooting; the victim of the shooting and the witness were rivals for the affections of a named female; the witness was at the house of the woman on the day of the shooting and had been there a number of times in the past; on the Monday before the shooting on Thursday defendant drove the witness to the woman's house and the witness then ran out of the house with the murder victim chasing him with what appeared to be a shotgun; the witness came back to defendant's house fifteen minutes after the shooting in question and five minutes after they had parted company and told defendant to keep quiet about the shooting and "he would not say anything" and "everything was under control"; and the witness had at one time lied to police officers in telling them that he did not know where the gun used in the shooting was located.

### 5. Criminal Law § 135.4— sentencing phase — prior conviction of felony

In a first degree murder case evidence was sufficient for the jury to find in the sentencing phase of the trial the aggravating circumstance that defendant had been previously convicted of a felony involving the use or threat of violence to the person, since defendant had testified in the guilt phase that he had been convicted of armed robbery in Virginia five years prior to the shooting in question, and he further stated that he had served about two years in Virginia prisons and had been on parole about ten months at the time of the shooting.

**6. Criminal Law § 135.4— sentencing phase — prior conviction of felony involving violence to person**

　　When the State establishes that defendant was convicted of a felony which involved the use or threat of violence to the person and the conduct upon which this conviction was based occurred prior to the event out of which the capital offense arose, the aggravating circumstance listed in G.S. 15A-2000(e)(3) must be submitted to the jury, and there was thus no merit to defendant's contention that the State must in fact show him to have acted violently in the previous felony rather than merely showing a previous felony involving violence.

**7. Criminal Law § 135.4— sentencing phase — instruction on heinous murder improper**

　　In a first degree murder case the trial court, during sentencing phase of the trial, erred in instructing the jury to consider as an aggravating circumstance whether the murder was especially heinous, since the evidence tended to show that defendant, after riding around and drinking beer most of the evening, saw the victim and shot him three times from behind without any established motive and then fled; the victim lingered for twelve days and then died from the gunshot wounds; and this was heinous but not "especially heinous" within the meaning of that term as used in G.S. 15A-2000(e)(9).

APPEAL by defendant from *Britt, J.,* 16 June 1980 Criminal Session, PERSON Superior Court.

Upon plea of not guilty, defendant was tried upon a bill of indictment charging him with murder in the first degree of Willard Lawrence Bailey.

On 21 February 1980 in Roxboro, North Carolina, Bailey was shot three times as he talked on a public telephone in the parking lot of a store known as Convenience Corner. Pricilla Betterton, an off-duty policewoman, was in her car in the parking lot, heard the shots and saw Bailey run by her into the Convenience Corner. Betterton got out of her car as Bailey emerged from the store. Over objection, at trial, Betterton was allowed to testify that Bailey told her William Hamlette shot him and that Hamlette left with Earl Torain. Similar statements made to another officer a few minutes later were also admitted in evidence over defendant's objection.

Bailey was taken to Person Memorial Hospital for emergency surgery. He was moved to N. C. Memorial Hospital in Chapel Hill on 25 February 1980. Bailey lingered twelve days after the shooting and died. The trial court admitted several statements made by Bailey to others during his hospitalization which identified defendant as his assailant.

Earl Torain testified for the State and identified defendant as

the perpetrator of the crime and described how the shooting took place. Defendant denied shooting Bailey and asserted Torain shot him.

The jury found defendant guilty of first degree murder. In the sentencing phase, the jury found two aggravating circumstances: (1) defendant had been previously convicted of a felony involving the threat or use of violence to the person and (2) the murder was especially heinous. The jury found no mitigating circumstances and recommended a penalty of death. Judgment was entered upon the jury recommendation and defendant appealed.

*Rufus L. Edmisten, Attorney General, by Thomas F. Moffitt, Assistant Attorney General, for the State.*

*James E. Ramsey and Mark Galloway, attorneys for defendant appellant.*

HUSKINS, Justice.

Defendant assigns three errors to the guilt determination phase and eight errors to the sentence determination phase of the trial. We shall address all errors in the guilt phase. In view of our disposition in that phase requiring a new trial, we discuss only two of the errors assigned in the sentencing phase.

### Guilt Phase

[1] In his first assignment of error, defendant contends the trial court erred in permitting police officers Pricilla Betterton and Steve Clayton to relate the victim's statements made to them within three to thirteen minutes of the shooting. Defendant argues the statements lacked the necessary spontaneity to qualify as part of the *res gestae*. We disagree and uphold the trial court's admission of the spontaneous utterances as part of the *res gestae*.

At approximately 11 p.m. on the night of 21 February 1980, Betterton was sitting in her car in the Convenience Corner parking lot. She was off duty but in uniform. She heard four to six gunshots and saw Bailey run by her car into the convenience store and say something to the attendant. The attendant picked up the phone and appeared to make a phone call. Before the attendant replaced the receiver, Bailey came back outside. Betterton approached him and saw he had been shot. Blood was coming from his mouth and the front of his shirt. She first asked him to sit down and he did. She

asked him was was wrong and who shot him. He replied, "William Hamlette." This occurred within three minutes after the gunshots were fired. She broke off the conversation and went into the store to ascertain if an ambulance and the police had been called. She picked up a brown paper bag upon which to make notes and returned to Bailey. No more than one minute had passed. She asked him a second time who shot him and he again responded, "William Hamlette." She asked how he left and Bailey said he left with Earl Torain in a 1965 Mercury. She asked if they had an argument and Bailey responded that he was hurting and wanted an ambulance.

Within two minutes an ambulance and Officer Clayton arrived. This was ten minutes after the shots were fired. Clayton received the call on the shooting at 11:03 and arrived on the scene at 11:08. He talked with Betterton for two minutes and then talked to Bailey as the ambulance attendants prepared him for the trip to the hospital. Clayton observed blood running out of his mouth and a bloodstain on his shirt. In response to Clayton's questions, Bailey stated he had been shot by William Hamlette; Earl Torain was with Hamlette; Hamlette and Torain left in a 1965 Mercury headed north toward South Boston; the shooting had occurred at the telephone booth, and "he could see the people when the shooting occurred."

The trial court conducted *voir dire* examinations of both Betterton and Clayton and concluded statements made to them by Bailey were admissible under the *res gestae* rule. Defendant argues the statements were hearsay narratives of the shooting, a prior event, and were not made contemporaneously with the event or with enough spontaneity to qualify as admissible *res gestae* statements.

Statements are admissible as spontaneous utterances when made by a participant or bystander in response to a startling or unusual incident whereby the declarant is without opportunity to reflect or fabricate. *State v. Bowden,* 290 N.C. 702, 228 S.E.2d 414 (1976); *see generally,* 1 Stansbury's N. C. Evidence § 164 (Brandis rev. 1973); McCormick on Evidence § 297 (1972). "[S]uch statements derive their reliability from their spontaneity when (1) there has been no sufficient opportunity to plan false or misleading statements, (2) they are impressions of immediate events and (3) they are uttered while the mind is under the influence of the activity of the surroundings." *State v. Deck,* 285 N.C. 209, 214, 203 S.E.2d 830, 833-34 (1974); *see also State v. Johnson,* 294 N.C. 288, 239 S.E.2d 829

(1978); *State v. Cox*, 271 N.C. 579, 157 S.E.2d 142 (1967). It is this *spontaneity* and not being *part* of the incident which makes it relevant evidence. For example, where the utterance is made by an observer and not a participant, the statement may be admissible. *See, e.g., State v. Feaganes*, 272 N.C. 246, 158 S.E.2d 89 (1967). Also, statements made after and therefore not part of the event are admissible if they are spontaneous utterances. *See, e.g., State v. Spivey*, 151 N.C. 676, 65 S.E. 995 (1909); Annot., 4 A.L.R.3d 149 (1965).

In the instant case, only three minutes passed between the witness Betterton's hearing of the shots and Bailey's statement that defendant shot him. Within thirteen minutes after the shooting, Bailey told Clayton that defendant had shot him. When he made these statements, he was suffering from three gunshot wounds, was bleeding from the mouth and chest, was at the crime scene and, at the time of the second statement, was being prepared by ambulance attendants for the trip to the hospital. These circumstances support the trustworthiness of these statements made while the victim was under the immediate influence of the act. The statements are admissible spontaneous utterances.

The statements do not in any way lose their spontaneous character because they were in response to questions such as: "What is wrong?" "Who shot you?" "How did they leave?" *See, e.g., State v. Johnson, supra* ("Who shot you?"); *State v. Cousin*, 291 N.C. 413, 230 S.E.2d 518 (1976) ("What happened?"). This was not a situation wherein the declarant had time to reflect and fabricate untruthful answers. Rather, the responses were excited reactions to a startling event.

In his second assignment of error, defendant argues the trial court erred in admitting certain hearsay testimony to the effect that the victim identified defendant as the man who shot him. This questioned testimony was admitted into evidence as dying declarations of the victim.

Under the dying declaration hearsay exception, the State sought to offer the testimony of three witnesses that the victim identified defendant as the person who shot him. The testimony of Linda Walton to this effect was excluded while that of Debbie Moss and police officer Melvin Ashley was admitted.

[2] Dying declarations by the person whose death is at issue have

long been admissible in North Carolina provided: (1) at the time they were made the declarant was in actual danger of death; (2) he had full apprehension of the danger; (3) death did in fact ensue; and (4) defendant, if living, would be a competent witness to testify to the matter. *State v. Stevens*, 295 N.C. 21, 28, 243 S.E.2d 771, 776 (1978); *State v. Crump*, 277 N.C. 573, 178 S.E.2d 366 (1971); *State v. Poll*, 8 N.C. 442, 9 Am. Dec. 655 (1821); *see generally* 1 Stansbury's N. C. Evidence § 146 (Brandis rev. 1973). The General Assembly codified the essentials of these requirements in G.S. 8-51.1 which reads:

> The dying declarations of a deceased person regarding the cause or circumstances of his'death shall be admissible in evidence in all civil and criminal trials and other proceedings before courts, administrative agencies and other tribunals to the same extent and for the same purposes that they might have been admissible had the deceased survived and been sworn as a witness in the proceedings, subject to proof that:
>
> (1) At the time of the making of such declaration the deceased was conscious of approaching death and believed there was no hope of recovery;
>
> (2) Such declaration was voluntarily made.

The party seeking admission of the out-of-court statement need not show that the declarant stated he had given up all hope of living or considered himself to be in the throes of death. All that must be shown is that the declarant believes he is going to die. *State v. Stevens, supra; State v. Lester*, 294 N.C. 220, 240 S.E.2d 391 (1978). This belief is best shown by his express communication to this effect. *State v. Lester, supra.* However, it is not necessary that declarant personally express his belief that he has no chance of recovery. This may be shown by the circumstances. *State v. Brown*, 263 N.C. 327, 139 S.E.2d 609 (1965); *State v. Franklin*, 192 N.C. 723, 135 S.E. 859 (1926). The rationale behind this exception to the hearsay rule is the general trustworthiness of statements made under such circumstances. The ordinary motives for falsehood are absent and there are powerful considerations which would impel the dying declarant to speak the truth, perhaps more so than does a solemn oath in court. *State v. Stevens, supra; State v. Lester, supra.* The admissibility of these declarations is a decision for the trial judge, and appel-

late review is limited to the narrow question of whether there is any evidence tending to show the prerequisites of admissibility. *State v. Stevens, supra,* 295 N.C. at 28-29, 243 S.E.2d at 776; *see also State v. Bowden,* 290 N.C. 702, 228 S.E.2d 414 (1976). With these rules of evidence in mind, we turn to the hearsay testimony of the three witnesses which the State sought to offer as dying declarations.

**[3]** The only question as to admissibility in all three situations is whether the declarant had full apprehension of his danger. Clearly, the other prerequisites to competency contained in G.S. 8-51.1 and our case law were met. For example, defendant does not contest the competency of the declarant to testify had he lived nor the fact that death was impending even though the declarant lingered twelve days before finally dying. We address the declarations in the order in which the declarant made them in the last days of his life.

　　　　Melvin Ashley, a police officer, was called as a defense witness. Upon cross-examination, Ashley testified about a communication to him by Bailey at the Person County Hospital approximately thirty minutes after the shooting. Doctors had just finished hooking Bailey up to a blood transfusion. He was prepared for surgery for three gunshot wounds which had caused substantial pain and hemorrhaging in the upper body and mouth. No one told Bailey he was dying and Bailey did not indicate he had such a belief. At this point, Ashley asked Bailey who shot him and Bailey identified defendant as the man who shot him. The trial court conducted a *voir dire* and concluded the statement was admissible as a dying declaration. The evidence supports the ruling of the trial court. The wounds, the time and the surroundings were such that a man could justifiably believe his death was imminent and believe he had no hope of recovery. The fact that Bailey lingered for several days does not render this statement inadmissible. In *State v. Franklin,* 192 N.C. 723, 135 S.E. 859 (1926), this Court upheld the admission, as a dying declaration, of a statement made under similar circumstances. In the *Franklin* case, "at the time deceased made the declarations offered as evidence, he had been shot in the abdomen and was suffering intense pain. One of the declarations was made to a neighbor who came to his home immediately upon learning that deceased had been shot; another was made to the physician and surgeon at the hospital to which deceased was taken for an operation, and just before the operation was performed; and the other was made to a brother of deceased, on Monday morning after deceased had been fatally

wounded on the preceding Sunday afternoon." 192 N.C. at 724, 135 S.E. at 860. The declarant's statements were admitted as dying declarations even though the declarant did not die for three days. The statement to Ashley in the present case is no different from the admitted statement in the *Franklin* case to the hospital physician just after the shooting and just before an operation was performed. The statement may also have been admissible as a spontaneous utterance in view of the circumstances and the short time lapse from the actual shooting to the time the statement was made. Within the thirty minutes, declarant could hardly have fabricated the identity of his assailant. *See State v. Cousin, supra; State v. Bowden, supra.*

The next statement the State sought to offer as a dying declaration was made by Bailey to a girlfriend, Linda Walton, at 11:30 on the morning of Bailey's first full day in N. C. Memorial Hospital in Chapel Hill. This was Tuesday, 26 February 1980, four days after the shooting. At this time, Bailey was on a respirator and receiving intervenous transfusions. He had a urine bag. A tube ran from his nose into his stomach. He could not talk but did communicate by writing, which he was allowed to do at his own insistence. He wrote, "I came here last night." Walton acknowledged that she knew this. Bailey then wrote the name "William Hamlette." Walton asked if Hamlette was the one who shot him and he nodded his head yes. He then held up three fingers and wrote, "He shot me three times from behind." Walton testified on *voir dire* cross-examination about Bailey's condition when he made these incriminating declarations as follows:

> When I saw him first was on the Tuesday. He could not smile or talk because of the respirator in his mouth. I thought from his reaction that he was glad to see me. He tried to move and speak but could not. In my opinion he could have spoken were it not for the respirator. His handwriting was legible even on a paper towel. There was nothing wrong with his handwriting, and nothing wrong with his looks or the look in his eye. Nothing indicated to me that death was imminent. He did not say he thought he was dying. He wrote, "When I get out of here, I want you to pick me up," and I said "okay."

The trial court correctly concluded the statements to Linda Walton were not admissible as dying declarations. There is no indication Bailey believed he was near death. Nor do the circumstances sur-

rounding this statement indicate death was obviously imminent. The statements would, however, be admissible to corroborate Bailey's dying declarations or spontaneous utterances identifying his assailant. *State v. Harding,* 291 N.C. 223, 230, 230 S.E.2d 397, 401 (1976).

The final statements the State sought to offer as dying declarations were those made to Debbie Moss, another of Bailey's girlfriends. Linda Walton visited Bailey in the hospital only twice before he died — the first time on Bailey's first day at N. C. Memorial, Tuesday, 26 February 1980, and the second time on Friday, 29 February 1980. Moss, on the other hand, visited Bailey several times during the twelve days before he died. She visited him at both Person Memorial Hospital and N. C. Memorial Hospital. It is not clear from the record exactly how many times or when Bailey told her William Hamlette shot him. It was clearly more than once and the last was within two days of his death. It appears that one time was "when he first got over there" — that is, when he was transferred to N.C. Memorial. He could not talk but wrote the initials "W. H." which he indicated by nodding his head meant William Hamlette. (Interestingly, at no point does Moss's testimony tie up Hamlette as the assailant.) At the time Bailey made these statements, he was in the intensive care unit with "a lot of machines hooked up to him." On one visit, Moss told Bailey she was pregnant, and he wrote on a piece of paper with a pen, "I don't know yet to have it or not." She further testified that "during all of the visits in Chapel Hill he wrote on my hand once and he wrote on a piece of paper once the message that I just testified about." A reasonable interpretation of his statement concerning the child, allegedly his child, being carried by Debbie Moss is that he was unsure he would live to enjoy and support it.

The trial court concluded these were dying declarations made under the apprehension of death. The testimony of Moss in the record before us is unclear. We are unable to determine whether these statements were dying declarations. In view of the remand for a new trial on another ground, we will not pass upon the admissibility of the declarations to Moss by the victim. Upon retrial of the case if Moss is again examined, the trial court must make a ruling on the admissibility of this evidence based upon the rules of evidence set forth in this case and in our other decisions. We do, however, note that even if the statements are inadmissible as dying declarations,

they may be competent to corroborate the dying declarations and spontaneous utterances of the deceased to others. *See State v. Harding, supra.*

**[4]** Defendant's third and final assignment of error in the guilt phase deals with the exclusion of evidence that the offense was committed by another. We hold the evidence was erroneously excluded.

Defendant testified it was not he but the State's witness Earl Torain who shot the deceased. Defendant testified he was driving his car north on U.S. 501 with Torain in the passenger seat and Torain directed him to turn around and enter the Convenience Corner parking lot. Defendant did so without any knowledge of Torain's intention to shoot someone. Defendant testified Torain opened fire on Bailey without any warning.

Defendant claims evidence excluded by the trial court would show Bailey and Torain were rivals for the affections of Debbie Moss which would therefore establish a motive for the shooting. The excluded evidence is summarized as follows:

1. Earl Torain was also arrested and charged with the shooting.

2. Earl Torain was at the house of Debbie Moss on the day of the shooting and had been there a number of times in the past. He came to her home about twice a week. Moss had been out to eat with Torain once before 21 February 1980 and several times since the shooting.

3. Defendant was allowed to testify that on the Monday before the shooting on Thursday, he drove Earl Torain to Debbie Moss's house. The trial court then excluded testimony that Torain ran out of the house with Bailey chasing him with what appeared to be a shotgun.

4. Torain came back to defendant's house fifteen minutes after the shooting and five minutes after they had parted company and told defendant to keep quiet about the shooting and "he would not say anything if I would not say anything" and "everything was under control."

5. Torain had at one time lied to police officers in telling them he did not know where the gun used in the shooting was located.

Defendant maintains this evidence corroborates his version of the shooting and establishes a clear motive for Torain to shoot Bailey.

The State rebuts defendant's arguments on each evidentiary item as follows:

1. The only reason a warrant was issued for Torain was because he was present at the scene with the person who allegedly fired the shots. There was no other evidence implicating Torain and the charges were, therefore, dropped.

2. Debbie Moss testified that Earl Torain came to her home to visit her mother.

3. This inquiry was based on the love-triangle theory which had already been discredited during the testimony of Debbie Moss. Such evidence was irrelevant.

4. Torain denied going to defendant's apartment after the shooting and the testimony by defendant as to what defendant allegedly said at the apartment was self-serving hearsay.

5. Any error in excluding testimony by the officer that Torain had not told him about the location of the gun was harmless since Torain had already testified he told the officers he did not know where the murder weapon was and later changed his mind and brought the weapon to the officers.

A defendant may introduce evidence tending to show that someone other than defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible. *State v. Stanfield*, 292 N.C. 357, 233 S.E.2d 574 (1977); *State v. Jenkins*, 292 N.C. 179, 232 S.E.2d 648 (1977); *State v. Shinn*, 238 N.C. 535, 78 S.E.2d 388 (1953); *State v. Smith*, 211 N.C. 93, 189 S.E. 175 (1937). "[T]he admissibility of another person's guilt now seems to be governed, as it should be, by the general principle of relevancy under which the evidence will be admitted unless in the particular case it appears to have no substantial probative value." 1 Stansbury's N. C. Evidence § 93 at 302-03 (Brandis rev. 1973).

Here, the evidence in question pointing to Torain should have been admitted. It was all relevant as direct or corroborative evi-

dence pointing directly to Torain as the guilty party. This evidence went beyond inference or conjecture. *State v. Jenkins, supra,* provides a ready contrast to the present case. In *Jenkins,* the defendant was charged with an armed robbery which occurred on 8 November 1975. The prosecuting witness was not permitted to testify that he recalled an earlier incident in the spring or summer of 1975 involving his refusal to sell beer to two intoxicated individuals. The defendant contended this was evidence that other persons might have a motive to rob the prosecuting witness. We held there was no error in the exclusion because the evidence did not point directly to another. In the case at hand, the excluded evidence does point directly to Torain. Its exclusion was error prejudicial to defendant which entitles him to a new trial.

### *Sentencing Phase*

In view of our disposition of matters in the guilt phase, we will discuss only those assigned errors in the sentencing phase which may arise upon retrial of the case and which defendant contends are not controlled by our previous decisions on capital sentencing. *See State v. Barfield,* 298 N.C. 360, 259 S.E.2d 510 (1979), *cert. den.,* 448 U.S. 907, 65 L.Ed.2d 1137, 100 S.Ct. 3050 (1980); *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. den.,* 446 U.S. 941, 64 L.Ed.2d 796, 100 S.Ct. 2165 (1980); *State v. Johnson,* 298 N.C. 47, 257 S.E.2d 597 (1979); *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979).

Defendant contends the trial court erred in instructing the jury to consider defendant's prior conviction of armed robbery as an aggravating circumstance because (1) such instruction was not authorized under the facts of the case and (2) such an instruction does not require the jury to consider defendant's past with care and deliberation when deciding on punishment. Defendant's arguments on this aggravating circumstance are without merit.

[5]   Under the provisions of G.S. 15A-2000(e)(3), the jury may find as an aggravating circumstance that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person."

> This section requires that there be evidence that (1) defendant had been convicted of a felony, that (2) the felony for which he was convicted involved the "use or threat of violence to the person," and that (3) the conduct

upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose. If there is no such evidence, it would be improper for the court to instruct the jury on this subsection.

*State v. Goodman, supra,* 298 N.C. at 22, 257 S.E.2d at 583.

There is substantial evidence supporting this aggravating circumstance. Defendant testified in the guilt phase he had been convicted of armed robbery in Virginia five years prior to the shooting of Bailey. He further stated he had served about two years in Virginia prisons and had been on parole about ten months at the time of the shooting. *Armed* robbery is a felonious crime which involves "use or threat of violence to the person."

**[6]** Defendant's second argument attacking an instruction on this aggravating circumstance is that G.S. 15A-2000(e)(3) omits consideration of the actual nature of defendant's acts and the extent of his involvement in the previous felony "involving the use or threat of violence to the person." Defendant contends the State must in fact show him to have acted violently in the previous felony rather than merely showing a previous felony involving violence. Defendant cites as examples the conviction of the driver as opposed to the gunman or the accessory as opposed to the principal in felonies involving the threat or use of violence. The record of this case contains no evidence of the extent of defendant's participation or involvement in the felonious armed robbery over five years ago in Virginia. He contends this deprives him of the right to have the jury give careful and deliberate consideration to his past conduct when deciding on punishment. *See Lockett v. Ohio,* 438 U.S. 586, 57 L.Ed. 2d 973, 98 S.Ct. 2954 (1978); *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976).

There is no merit in these arguments. All the State need prove to have this aggravating circumstance submitted to the jury are the evidentiary matters explained in *Goodman* and set forth in the statute. When the State establishes that defendant was (1) convicted of a felony which (2) involved the "use or threat of violence to the person" and (3) the conduct upon which this conviction was based occurred prior to the events out of which the capital offense arose, the aggravating circumstance listed in G.S. 15A-2000 (e) (3) must be submitted to the jury. *State v. Silhan,* 302 N.C. 223, 275

State v. Hamlette

S.E.2d 450 (1981). On its face, armed robbery involves the threat or use of violence to the person. Defendant may, of course, present evidence, if he has any, in mitigation of his involvement in the previous felony which triggers this aggravating circumstance.

[7] Defendant also contends the trial court erred in instructing the jury to consider as an aggravating circumstance whether the murder was especially heinous. *See* G.S. 15A-2000 (e) (9). Defendant argues the crime was not especially heinous, and we agree.

The instruction on "especially heinous" was in conformity with definitions and statements of law approved in *State v. Goodman*, 298 N.C. 1, 25-26, 257 S.E.2d 569, 585 (1979), and *State v. Johnson*, 298 N.C. 47, 81-82, 257 S.E.2d 597, 621 (1979). However, it was improper to submit this aggravating circumstance for jury consideration because the evidence is insufficient to support a finding that this was an especially heinous capital felony. In *Goodman*, we adopted the view that this aggravating circumstance does not arise unless the murder is a "conscienceless or pitiless crime which is unnecessarily tortuous to the victim." In doing so, we limited the application of this circumstance so it would not become "a 'catchall' provision which can always be employed in cases where there is no evidence of other aggravating circumstances." 298 N.C. at 25, 257 S.E.2d at 585.

According to the evidence in the present case, defendant, after riding around and drinking beer most of the evening, saw the victim and shot him three times from behind without any established motive and then fled. The victim lingered for twelve days and died from the gunshot wounds. This was heinous but not "especially heinous" within the meaning of that term as used in the statute. In comparison with other capital cases we have decided, it was not unnecessarily tortuous or outrageously wanton or vile. *Contrast State v. Goodman, supra*, and *State v. Johnson, supra, with State v. Oliver and Moore*, 302 N.C. 28, 274 S.E.2d 183 (1981). This aggravating circumstance should not have been submitted to the jury.

For the errors noted, defendant is entitled to a

New trial.