IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-312

No. COA20-528

Filed 6 July 2021

Davie County, No. 17 CRS 246

STATE OF NORTH CAROLINA

v.

CARLOS GARCIA LOWERY, A/K/A CARLOS GARCIA LOWERY, Jr.

Appeal by Defendant from Judgment entered 24 January 2019 by Judge Joseph N. Crosswhite in Davie County Superior Court. Heard in the Court of Appeals 14 April 2021.

*Attorney General Joshua H. Stein, by Solicitor General Fellow Heyward Earnhardt, Solicitor General Ryan Y. Park, and Assistant Solicitor General Nicholas S. Brod for the State.*

*Attorney Paul F. Herzog for defendant-appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

¶ 1     Carlos Lowery (Defendant) appeals from Judgment entered 24 January 2019 upon his conviction of Second-Degree Murder. The Record before us, including evidence presented at trial, tends to show the following:

¶ 2     Terry Smoot (Smoot) was "the neighborhood runner" for a neighborhood near downtown Mocksville. As the "neighborhood runner," Smoot would sometimes buy

items, like beer, from the store for people in the neighborhood but would also obtain "crack or weed" for people. Smoot also allegedly worked for Defendant as a runner for drug sales in order to reduce the number of people coming and going from Defendant's residence.

¶ 3        On 25 October 2016, Smoot visited the "Soda Shop," a convenience store in the neighborhood. Recordings from that day showed Smoot enter the store, purchase a pack of cigarettes, and leave at 3:08 p.m.

¶ 4        Edgar Pozo (Pozo) and Smoot had been friends since 2004. At 4:30 p.m. on 25 October 2016, Pozo finished his shift at Panel Service Component International (PSC) and began walking home. Pozo's residence was approximately a five-minute walk from the PSC facility, and the walk required Pozo to cross some railroad tracks. As Pozo approached the railroad tracks, he heard someone call out "Ed." "Ed" was a nickname given to Pozo by Smoot. Pozo saw Smoot "lying there" and bleeding from the mouth.

¶ 5        Pozo asked Smoot what happened, to which Smoot replied, "Red beat me up." Evidence at trial revealed Defendant was known to go by the nickname "Red."

¶ 6        Smoot asked Pozo to "[t]ell [Smoot's] dad to tell [Smoot's] brother come get [Smoot]." Pozo left Smoot to inform Smoot's father of Smoot's condition, before heading home. After returning home, Pozo noticed that neither Smoot's father nor brother had left to help Smoot. As a result, Pozo went back to where he had found

Smoot. Upon returning, Pozo found Smoot "hunched" over in the same spot. Pozo tried helping Smoot to his feet, but Smoot "screamed and fell back down." Pozo realized Smoot was severely injured, prompting Pozo to call 9-1-1 around 4:55 p.m.

¶ 7        Shortly after, around 5:00 p.m., EMTs and local law enforcement began arriving. Roger Spillman (Officer Spillman), an on-duty patrol officer with the Mocksville Police Department, was the first to arrive. At trial Officer Spillman testified that upon arriving and seeing Smoot, he asked "[w]hat happened[?]" and "who did this to you?" Smoot responded, "Carlos Lowery" and "Red beat me up."

¶ 8        Around the same time Officer Spillman arrived, Detective Brian Nichols (Detective Nichols), with the Mocksville Police Department, also joined the scene. Detective Nichols testified he also approached Smoot and asked what happened, to which Smoot responded, again, by identifying Carlos Lowery as his attacker. The law enforcement officers then began securing the scene.

¶ 9        William Frye (Frye), a volunteer EMT, arrived on the scene near the time when Officer Spillman and Detective Nichols arrived. According to Frye, prior to conducting an initial medical assessment, he overheard Smoot tell Detective Nichols the name "Carlos Lowery" and "[he] jumped me." He further testified Smoot's speech had become garbled indicating Smoot was in pain, as he was unable to speak in complete sentences. Upon his initial assessment Frye observed Smoot was suffering from "labored breathing," "bleeding from the face," and "his cheeks [were] swollen

and around his eyes." However, Smoot remained adamant he wanted to go home rather than to the hospital. Chris Hefner (Lieutenant Hefner), a patrol supervisor for the Mocksville Police Department, was also at the scene that day. He also heard Smoot identify "Carlos Lowery" as his attacker.

¶ 10        Last at the scene were paramedics Brian Williams (Williams) and Kristie McManus (McManus). Williams described Smoot's mental state as "somewhat altered," as a result of his severe injuries. Williams and McManus placed Smoot in an ambulance to be transferred to Wake Forest Baptist Hospital for treatment. Before the ambulance left, Detective Nichols got in the ambulance and again asked Smoot who attacked him, to which Smoot again responded, "Carlos Lowery."

¶ 11        After the ambulance left, Detective Nichols canvassed the neighborhood to try and locate any potential witnesses. While canvassing, Detective Nichols came across two men sitting in front of a house near the scene. Detective Nichols asked the men if they knew a "Carlos Lowery," to which both men responded they did not. Detective Nichols later discovered one of the two men was, in fact, Carlos Lowery.

¶ 12        Smoot died at Wake Forest Baptist Hospital at 11:39 p.m. An autopsy found numerous abrasions and bruises on the exterior of Smoot's body. An internal examination revealed multiple rib fractures, likely caused by "blunt force injury," which would have made it difficult for Smoot to breathe. Smoot's lungs contained

substantial amounts of blood, and both his liver and kidneys were lacerated. The blood vessels to Smoot's kidney were also transected.

¶ 13    A Davie County Grand Jury indicted Defendant on charges of First-Degree Murder and Common Law Robbery. Defendant's case came for trial in Davie County Superior Court on 14 January 2019.

¶ 14    Prior to trial, Defendant filed a Motion to Limit Evidence/Testimony to exclude testimony of the statements Smoot made to Pozo, EMTs, and law enforcement on the bases these statements were inadmissible hearsay and their admission would violate Defendant's constitutional rights to due process and to confront witnesses. On 10 January 2019, the trial court entered an Order denying Defendant's Motion to Limit Evidence/Testimony. Specifically, the trial court determined the statements made by Smoot to Pozo and Detective Nichols were "admissible under the excited utterance exception to the hearsay rule." The trial court further concluded the testimony of the other law enforcement officers and EMTs was admissible as corroborative of the statements to Pozo and Detective Nichols. The trial court did not separately address the constitutional grounds alleged in Defendant's Motion.

¶ 15    At trial, Pozo, the EMTs, and law enforcement officers testified as to the statements Smoot made to them at the scene of the incident. Defendant made general objections to the testimony regarding Smoot's statements about the identity of his assailant to Pozo, the EMTs, and law enforcement officers.

¶ 16      The State also presented testimony from Major Koula Black (Major Black), an Operations Manager for the Mocksville Police Department. In October 2016, Major Black was an undercover narcotics detective. Through the course of her employment, Major Black had become familiar with the phone system at the Davie County jail, including the use of PIN numbers and voice recognition to identify an inmate making a call. Major Black was called, in part, to testify about a phone call made from the Davie County jail between Defendant and Tanisha Gaither (Gaither). Major Black testified she was familiar with the voices of both Defendant and Gaither from her time in undercover work where she observed Defendant "very regular[ly]" at an address in the same Mocksville neighborhood where Smoot was assaulted, and identified Defendant as "the person [Major Black] came to know as Red or Carlos Lowery." The State then elicited testimony from Major Black about "general topics of conversation" in the call, before playing the call for the jury. Over Defendant's general objection, the trial court allowed Major Black to testify that during the call, Defendant said that on the day of the Smoot's death Defendant "got the cigarettes and the change, but not the phone." Major Black confirmed a "cell phone, U.S. currency and cigarettes" were items alleged to have been stolen from Smoot in the attack.

¶ 17      The jury found Defendant guilty of Second-Degree Murder, but acquitted Defendant on the charge of Common Law Robbery. The trial court sentenced

Defendant to 339 to 419 months in prison. Defendant gave oral Notice of Appeal in open court.

## Issues

The issues raised by Defendant on appeal are whether the trial court erred in admitting: (I) testimony from Pozo of statements made to him by Smoot identifying Defendant as the assailant under the excited utterance exception to the hearsay rule; (II) testimony from Officer Spillman, Detective Nichols, and Frye as to Smoot's statements identifying Defendant as the assailant in violation of Defendant's constitutional rights under the Confrontation Clause; and (III) testimony from Major Black about the contents of the recorded telephone call between Defendant and Gaither.

## Analysis

### I. Excited Utterance

Defendant first contends the trial court committed prejudicial error by admitting Pozo's testimony that Smoot identified Defendant by Defendant's nickname "Red" as Smoot's assailant under the "excited utterance" exception to the hearsay rule pursuant to N.C. R. Evid 803(3). "When preserved by an objection, a trial court's decision with regard to the admission of evidence alleged to be hearsay is reviewed *de novo*." *State v. Johnson*, 209 N.C. App. 682, 692, 706 S.E.2d 790, 797 (2011).

¶ 20 " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2019). Generally, "[h]earsay is not admissible, except as provided by statute[.]" N.C. Gen. Stat. § 8C-1, Rule 802 (2019). One such exception are statements that may be classified as "excited utterances." Excited utterances are defined by statute as "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C. Gen. Stat. § 8C-1, Rule 803(2) (2019). "In order to fall within this hearsay exception, there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication." *State v. Smith*, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985).

¶ 21 First, on appeal, Defendant makes no argument the alleged assault on Smoot would not qualify as a "sufficiently startling experience" under the excited utterance exception. *See generally State v. Coria*, 131 N.C. App. 449, 508 S.E.2d 1(1998) (statements following an assault qualifying as an excited utterance). Rather, Defendant argues Smoot's statements to Pozo were sufficiently remote in time from the assault and that Smoot was not in a condition of excitement when he made the statements such that Smoot's statements were not "a spontaneous reaction," but instead "one resulting from reflection or fabrication." Specifically, Defendant

contends because it is impossible to pinpoint the exact time of the attack given the approximate hour and a half between the time Smoot left the Soda Shop and when Smoot made the statements to Pozo, after Pozo first discovered Smoot, it is possible the assault had occurred "perhaps as much as 75 to 90 minutes" earlier. Defendant's argument, however, rests on a speculative assessment of the facts precisely because the Record does not disclose how much time elapsed from the assault until the statements were made. Put another way, the assault may have occurred just minutes before Pozo found Smoot but no more than approximately 75-90 minutes before.

¶ 22        "Moreover, '[w]hile the period of time between the event and the statement is without a doubt a relevant factor, the element of time is not always material,' and the 'modern trend is to consider whether the delay in making the statement provided an opportunity to manufacture or fabricate the statement.' " *Coria*, 131 N.C. App. at 451, 508 S.E.2d at 3 (alterations in original) (quoting *State v. Thomas*, 119 N.C. App. 708, 712-13, 460 S.E.2d 349, 352 (1995)). As the Official Commentary to Rule 803 notes: "the standard of measurement is the duration of the state of excitement. 'How long can excitement prevail? Obviously there are no pat answers and the character of the transaction or event will largely determine the significance of the time factor.' " N.C. Gen. Stat. Ann. § 8C-1, Rule 803 cmt. (2019). For example, in *State v. Hamlette*, our Supreme Court concluded statements were properly admitted as excited utterances where:

> only three minutes passed between the witness Betterton's hearing of the shots and [the victim's] statement that defendant shot him. Within thirteen minutes after the shooting, [the victim] told [Officer] Clayton that defendant had shot him. When he made these statements, he was suffering from three gunshot wounds, was bleeding from the mouth and chest, was at the crime scene and, at the time of the second statement, was being prepared by ambulance attendants for the trip to the hospital.

302 N.C. 490, 495, 276 S.E.2d 338, 342 (1981). The Court reasoned: "These circumstances support the trustworthiness of these statements made while the victim was under the immediate influence of the act." *Id.* Notably, the Court also observed: "The statements do not in any way lose their spontaneous character because they were in response to questions such as: 'What is wrong?' 'Who shot you?' 'How did they leave?'" *Id.* (citations omitted).

This Court has focused the temporal inquiry in terms of whether the declarant "was still under the stress of a startling event and . . . therefore had no opportunity to reflect on her statements." *Coria*, 131 N.C. App. at 452, 508 S.E.2d at 3. *Coria* is particularly instructive in this case because there, as here, the record did not disclose the lapse in time between the assault and the declarant's statements first to a witness and later to a law enforcement officer. *Id.* at 450, 508 S.E.2d at 2. In that case, a witness observed the female victim running out of the woods having crossed a ravine. *Id.* The victim was upset and had a bruised and swollen face and bloody nose and lip. The victim told the witness the defendant had assaulted her while they were at the

defendant's home, and she had subsequently fled. *Id.* The victim also recounted similar statements to a law enforcement officer who later responded to the witness's home. *Id.* Our Court determined these statements were made while the victim was still under the stress of a startling event and properly admitted as excited utterances where, in part, the victim was "very excited and upset, had obviously been hit about the face, and at times lapsed into her native tongue[.]" *Id.* at 452, 508 S.E.2d at 3.

¶ 24 Here, the witness, Pozo¸ found the victim, Smoot, at the apparent crime scene, injured and bloody following the assault, hunched on the ground requesting help. Defendant nevertheless argues because Pozo initially described Smoot as "calm" and that although Smoot was in pain, Pozo's first observation was that he "didn't think it was that bad really," Smoot was neither excited nor in such pain from his injuries that he made these statements under the stress or excitement of the assault. Defendant's arguments, however, ignore the facts that at the time Smoot had sustained multiple rib fractures, internal bleeding, damage to internal organs, and was aspirating blood. These injuries made it difficult for Smoot to breathe or move, and eventually contributed to his death. On these facts, we cannot conclude Smoot no longer acted under the stress of excitement caused by the assault, when he made

the statements to Pozo.[1]  *See State v. Kerley*, 87 N.C. App. 240, 243, 360 S.E.2d 464, 466 (1987).  Thus, Pozo's testimony as to Smoot's statements identifying Defendant as the assailant were properly admitted as excited utterances.  Therefore, the trial court did not err in denying Defendant's pre-trial Motion to exclude these statements or by overruling Defendant's objection to this testimony at trial.

## II.  Confrontation Clause

Defendant contends the trial court violated his constitutional right to confront witnesses under the Confrontation Clause, when it admitted the statements by Smoot identifying him as the assailant through the testimony of Officer Spillman, Detective Nichols, and Frye.

However, as a threshold matter:

---

[1] Defendant cites *State v. Riley*, 154 N.C. App. 692, 572 S.E.2d 857 (2002), and *State v. Little*, 191 N.C. App. 655, 664 S.E.2d 432 (2008), as support for his position.  Both cases are, however, inapposite to this case.  In both of those cases, we affirmed instances where the trial court sustained an objection to hearsay and excluded statements as not constituting excited utterances.  Furthermore, in *Riley*, the defendant, who was charged with felony speeding to elude arrest, told the officer who arrested him following a crash that another occupant of the car told [the] defendant to flee because the person "had warrants against him" and had a gun at the time.  *Riley*, 154 N.C. App. at 694, 572 S.E.2d at 858.  Our Court stated: "defendant had only minor injuries and did not require medical treatment.  Although the record does not indicate the amount of time between [the] defendant's crashing the vehicle and making the statement, the record is clear that a sufficient amount of time had lapsed to provide [the] defendant with an opportunity to fabricate a statement."  *Id*. at 695, 572 S.E.2d at 859.  Likewise in *Little*, we upheld the trial court's exclusion of a witness statement given to a SBI agent "several hours" after the shooting in that case where the statement was "[c]learly . . . not the product of a 'spontaneous reaction, not one resulting from reflection or fabrication.' "  *Little*, 191 N.C. App. at 665, 664 S.E.2d at 439.

> In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.

N.C.R. App. P. 10(a)(1) (2021). More specifically, our Courts consistently recognize "[c]onstitutional issues not raised and passed upon at trial will not be considered for the first time on appeal." *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001).

¶ 27     Here, Defendant did raise the Confrontation Clause objection in his pretrial Motion to Limit Evidence/Testimony. However, in ruling on that Motion, the trial court based its decision solely on the statutory hearsay objection and made no reference to any state or federal constitutional provision, including the Sixth Amendment or the Confrontation Clause. Moreover, although Defendant also objected to the testimony at trial, the objection was general and did not specifically raise any constitutional ground for the exclusion of Smoot's statements. Thus, Defendant has not preserved this constitutional issue for appeal. *See* N.C.R. App. P. 10(a)(1) (2021); *see also State v. Lemons*, 352 N.C. 87, 91, 530 S.E.2d 542, 544 (2000) ("While [the] defendant clearly objected to the admission of . . . statements . . . on evidentiary grounds, we are unable to find any indication that at trial [the] defendant cited the Sixth Amendment or any constitutional grounds as the basis for his

objection to the admission of . . . [these] statements into evidence."); *State v. Mobley*, 200 N.C. App. 570, 572, 684 S.E.2d 508, 510 (2009) (objection on hearsay grounds did not invoke the Confrontation Clause). Furthermore, Defendant has not requested we invoke N.C.R. App. P. 2 or apply plain error review to this issue. Therefore, as the issue was not preserved for appeal, we do not address it.[2]

### III. Telephone Call

Defendant also contends the trial court erred in admitting testimony from Major Black regarding the contents of Defendant's telephone call to Gaither made from the Davie County jail. Specifically, Defendant argues the testimony constituted improper lay opinion testimony under Rule 701 of the North Carolina Rules of Evidence in that the recording itself was available and played for the jury and, thus, Major Black's testimony would not have been helpful to the jury's determination as to the content of the telephone conversation. First, however, Defendant raised only a general objection to this testimony. Thus, the basis for Defendant's objection at

---

[2] In a footnote in his brief to this Court, Defendant submits he is also renewing his hearsay arguments raised as to Pozo's testimony to the testimony of these three witnesses. However, Defendant makes no specific argument the trial court erred in admitting the testimony of these witnesses. Moreover, unlike Pozo's testimony, the trial court did not expressly ground admission of the law enforcement and EMT witnesses in the excited utterance hearsay exception. We deem those arguments abandoned. N.C.R. App. P. 28(b)(6) (2021).

trial is unclear and this argument could also be deemed unpreserved. *See* N.C.R. App. P. 10(a)(1) (2021).

¶ 29 Nevertheless, assuming Defendant's general objection preserved this issue for review, Rule 701 states: "If [a] witness is not testifying as an expert, [the witness's] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [the witness's] testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2019). "[W]hether a lay witness may testify as to an opinion is reviewed for abuse of discretion." *State v. Washington*, 141 N.C. App. 354, 362, 540 S.E.2d 388, 395 (2000), *disc. rev. denied*, 353 N.C. 396, 547 S.E.2d 427 (2001). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citation omitted).

¶ 30 As a general proposition:

> For a court to allow a witness in a criminal case to testify to the content of a telephone conversation, the identity of the person with whom the witness was speaking must be established. In such cases identity may be established by testimony that the witness recognized the other person's voice, or by circumstantial evidence.

*State v. Dial*, 122 N.C. App. 298, 309, 470 S.E.2d 84, 91 (1996) (citations omitted). Here, Major Black opined the speakers in the recorded telephone call were Defendant and Gaither based on both her familiarity with the procedures employed in the jail's telephone system used to identify the inmate making the call—Defendant—along with her own familiarity with both Defendant and Gaither and their respective voices. Major Black's lay opinion as to the identity of the speakers was therefore based on her own knowledge and perceptions. Indeed, Defendant did not object at trial and raises no argument on appeal about Major Black's identification of Defendant and Gaither as the speakers in the recording, instead focusing solely on Major Black's testimony about the general topics discussed in the telephone call. Thus, Major Black's testimony about the contents of the recorded telephone call was admissible on this basis.

¶ 31        Assuming further that Major Black's testimony about the general topics of conversation in the telephone call, based on Major Black's direct personal knowledge of the content of the recording, in fact, constitutes a lay opinion, it was plainly rationally based in Major Black's perception from listening to the recorded call. Again, Defendant does not contest this point. Instead, Defendant argues the trial court abused its discretion in admitting the testimony because Major Black's testimony was not helpful to the jury's clear understanding of the content of the call

or its determination of any fact in issue where the jury heard the recording and could draw its own conclusions as to the content of the conversation.

¶ 32          In support of his position, Defendant relies on our decision in *State v. Belk*, 201 N.C. App. 412, 689 S.E.2d 439 (2009).  In *Belk*, the defendant argued that the trial court erred in allowing a police officer to testify to the defendant's identity in a surveillance video tape.  *Belk*, 201 N.C. App. at 413, 689 S.E.2d at 440.  This Court recognized lay opinion testimony identifying a criminal defendant may be admissible where the testimony "would be helpful to the jury in the jury's fact-finding function rather than invasive of that function, and the helpfulness outweighs the possible prejudice to the defendant from an admission of the testimony."  *Id*. at 415, 689 S.E.2d at 441 (citation omitted).

¶ 33          However, there, the officer's familiarity with the defendant's appearance was confined to a few brief encounters of "minimal contact."  *Id*. at 417, 689 S.E.2d at 442.  Furthermore, "there was no evidence presented by either party tending to show that the individual depicted in the surveillance footage had disguised his appearance at the time of the offense or that Defendant had altered his appearance prior to trial."  *Id*.  Additionally, although the video initially was " 'very fuzzy' when shown on the large projection screen to the jury," any prejudice to the defendant was abated as the jurors also "had the opportunity to view the video footage on a personal computer."  *Id*. at 417, 689 S.E.2d at 443.  Thus, "[t]he only factor supporting the trial court's

conclusion [was the officer's] familiarity with Defendant's appearance, based on . . . brief encounters." *Id.* at 418, 689 S.E.2d at 443. This Court determined: "there was no basis for the trial court to conclude that the officer was more likely than the jury to correctly identify Defendant as the individual in the surveillance footage." *Id.* Accordingly, we held "the trial court erred by allowing [the officer] to testify that, in her opinion, the individual depicted in the surveillance video was Defendant." *Id.*

¶ 34        *Belk* is not applicable here. First, the issue in *Belk* was the officer's identification of the defendant. Identity—specifically, whether Major Black was better positioned to identify Defendant as the caller than the jury because of Major Black's familiarity with Defendant and Gaither or her ability to identify them or their voices on the call—is not at issue here. Further, unlike *Belk* where there were no issues of the clarity of the surveillance video and any issues with the projection to the jury were ameliorated, here, Defendant describes the recording of the call and Defendant's voice as "garbled," and the State describes the recording as "distorted." Given Major Black's familiarity with both the telephone system and with Defendant and Gaither and their voices, we cannot say then that there was "no basis for the trial court to conclude that the officer was more likely than the jury to correctly identify" the contents of the recording of the telephone call between Defendant and Gaither. *Id.*

Moreover, in *Belk*, we concluded the error in admitting the officer's testimony was prejudicial where "the State's case rested exclusively on the surveillance video and [the officer's] identification testimony." *Id.* Here, Major Black's testimony and the recording were not the only evidence from which the jury could conclude Defendant was Smoot's assailant. Indeed, as noted, there were numerous instances of witnesses identifying Defendant at trial. Thus, we cannot conclude there is a reasonable possibility that, had this testimony been excluded, the jury would have reached a different result. *See* N.C. Gen. Stat. § 15A-1443(a) (2019) ("A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."). Therefore, even if admission of Major Black's testimony constituted error, it did not rise to the level of prejudicial error requiring reversal or a new trial. Consequently, the trial court did not abuse its discretion or commit reversible error in admitting Major Black's testimony.

## **Conclusion**

Accordingly, for the foregoing reasons, there was no error in Defendant's trial and the Judgment is affirmed.

NO ERROR.

Judges DIETZ and ZACHARY concur.