STATE OF NORTH CAROLINA v. JACKIE RAY BREWER

No. 503A88

(Filed 7 December 1989)

1. **Criminal Law § 35 (NCI3d)— murder—evidence of guilt of another—excluded—no error**

The trial court did not err in a murder prosecution by excluding evidence that another person was responsible for the death of the victim where, even viewing the testimony in the light most favorable to defendant, it cannot be said to give rise to more than speculation and conjecture of a type which has been excluded consistently under N.C.G.S. § 8C-1, Rule 401. Evidence that another committed the crime for which defendant is charged is relevant and admissible if it does more than create an inference or conjecture and such evidence must point directly to the guilt of some specific other person or persons. The evidence here fails to point to a specific other person as the perpetrator of the crime with which defendant is charged. Moreover, any error is not prejudicial because defendant was able to present his hypothesis to the jury through the testimony of other witnesses.

**Am Jur 2d, Homicide § 296.**

2. **Criminal Law § 425 (NCI4th); Criminal Law § 88.1 (NCI3d)— murder—witnesses not testifying—questions and arguments— no prejudicial error**

There was no prejudicial error in a first degree murder prosecution in allowing the State to cross-examine defendant about the absence of an accomplice and defendant's six-year-old son as witnesses at defendant's trial and to argue the absence of those witnesses to the jury. Although the State's attempted cross-examination and jury argument with regard to both individuals was inappropriate, defendant's objection was promptly sustained and the court promptly admonished the prosecutor regarding his closing argument. Even assuming error, the direct and circumstantial evidence against defendant was substantial and compelling and the impact of the errors on the jury was not proven by defendant to be prejudicial.

**Am Jur 2d, Homicide § 254.**

STATE v. BREWER

[325 N.C. 550 (1989)]

3. **Criminal Law § 89 (NCI3d)— murder—testimony concerning reward—not improper comment on credibility of witness**

The trial court did not err in a first degree murder prosecution by admitting testimony from the husband of the decedent regarding the reason he gave reward money to a State's witness. Although defendant contended that the testimony constituted an improper opinion as to the State witness's credibility, the reward could in no way be interpreted as a testimonial to the witness's credibility and good character; furthermore, the jury was properly instructed as to the proper inference to be given to the testimony. N.C.G.S. § 8C-1, Rule 701.

**Am Jur 2d, Witnesses § 551.**

4. **Criminal Law § 46.1 (NCI3d)— murder—escape—defendant's state of mind—evidence excluded—no error**

The trial court did not err in a first degree murder prosecution by excluding evidence of defendant's state of mind, offered to refute the State's theory that defendant fled the state because he learned he was a suspect, where defendant took advantage of several opportunities to bring out the information and was in fact able to present much of the excluded evidence.

**Am Jur 2d, Homicide §§ 319, 448.**

5. **Criminal Law § 89.9 (NCI3d)— murder—transcript of earlier testimony excluded—no error**

The trial court did not err in a first degree murder prosecution by excluding from evidence a portion of the transcript of a State witness's testimony at the earlier trial of a codefendant where evidence to the same effect was otherwise admitted.

**Am Jur 2d, Homicide § 393.**

6. **Criminal Law § 85.3 (NCI3d)— first degree murder—defendant's association with murderers—not prejudicial**

There was no prejudice in a prosecution for first degree murder from the trial court's decision to allow the prosecutor to question defendant and a defense witness and to argue to the jury concerning defendant's association with a character who had been convicted of murder and the fact that defendant was known to associate with "murderers." Defendant himself opened the door to questions about the man's past, and the

court sustained defense objections to the prosecutor's line of questions and instructed the jury that defendant may not be convicted on the basis of something he may have done in the past.

**Am Jur 2d, Evidence §§ 340, 341, 343.**

7. **Criminal Law § 43.4 (NCI3d) — murder — photographs of defendant and codefendant — grotesque and unflattering — no error**

The trial court did not err in a first degree murder prosecution by allowing the State to introduce photographs of defendant and codefendant which allegedly were grotesque and unflattering where the photographs, while less than flattering, could not fairly be characterized as grotesque, defendant made no showing that the photographs in question made the parties look any different from the way they appeared at the day of the crime, and both defense counsel and the court admonished the jury that it was not to make its decision based on appearances or on sympathy.

**Am Jur 2d, Evidence §§ 784, 785.**

8. **Criminal Law § 89.8 (NCI3d) — murder — impeachment of witness — letter to judge — excluded**

The trial judge did not err in a first degree murder prosecution by prohibiting defense counsel from impeaching a State's witness with a letter the witness had written to a federal judge during a prior incarceration requesting a reduction in his sentence. Defendant extensively cross-examined the witness about his experience with the criminal justice system, specifically his history of plea bargaining, in order to show the witness's possible bias and the excluded letter was merely cumulative.

**Am Jur 2d, Evidence § 256.**

9. **Criminal Law § 107 (NCI4th) — first degree murder — discovery**

The trial court did not err in a first degree murder prosecution by failing to require the State and a witness's attorney to disclose evidence favorable to the defense where the requested material was inspected by the judge *in camera*, certain materials were in fact provided to the defense, the remaining documents were sealed for appellate review, and the Supreme Court did not discern any abuse of discretion in the exclusion of those documents. Neither the statutory provisions set out

in N.C.G.S. § 15A-903 nor waiver of the attorney-client privilege alters the general rule that the work product or investigative files of the district attorney, law enforcement agencies, and others assisting in preparation of the case are not open to discovery. Also, opposing counsel cannot compel the production of documents under the control of the witness on the stand where the witness does not utilize the writing sought to be produced.

**Am Jur 2d, Depositions and Discovery § 444.**

10. **Homicide § 30.3 (NCI3d)— first degree murder—refusal to instruct on involuntary manslaughter — alibi defense— no error**

The trial court did not err in a first degree murder prosecution by refusing to instruct on involuntary manslaughter where defendant was charged with first degree murder arising from the felony of discharging a weapon into occupied property and defendant limited himself to the defense that he was not in the area at any time that night. An intentional shooting at an object can amount to culpable negligence; however, where a defendant's sole defense is one of alibi, he is not entitled to have the jury consider a lesser offense on the theory that jurors may take bits and pieces of the State's evidence and bits and pieces of defendant's evidence and thus find him guilty of a lesser offense. N.C.G.S. § 14-34.1; N.C.G.S. § 15-170.

**Am Jur 2d, Homicide §§ 529-531.**

11. **Criminal Law § 415 (NCI4th)— first degree murder — State's closing argument—no error**

The trial court did not err in a first degree murder prosecution by failing to intervene ex mero motu in the prosecutor's argument where defendant contended that the State argued matters clearly intended to prejudice defendant and to elicit passion and sympathy for the victim. The prosecutor's argument, while inflammatory, was not improper to the point of being unduly prejudicial to defendant; defendant addressed the same matters in his argument to the jury, and the court's instructions also included these themes.

**Am Jur 2d, Trial §§ 280, 317.**

Chief Justice EXUM concurring.

Justice MITCHELL concurring in result.

Justice WEBB joins in this concurring opinion.

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by *Rousseau, J.*, at the 31 May 1988 Criminal Session of Superior Court, CATAWBA County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 11 September 1989.

*Lacy H. Thornburg, Attorney General, by Barry S. McNeill, Assistant Attorney General, for the State.*

*Robert M. Elliot and Ellen R. Gelbin for defendant-appellant.*

MEYER, Justice.

Defendant was originally tried at the 29 February 1988 session of the Superior Court of Forsyth County, Judge Julius A. Rousseau presiding. After a two-week trial, the jury deadlocked and the court declared a mistrial. The court granted defendant's motion for change of venue due to excessive publicity, and the case was retried at the 31 May 1988 session of the Superior Court of Catawba County, Judge Rousseau again presiding.

Defendant was convicted of first-degree murder for the death of Vickie White Calhoun under the felony murder rule. The conviction was for murder committed during the act of discharging a firearm into an occupied building, a felony under N.C.G.S. § 14-34.1. During the sentencing phase, the jury recommended life imprisonment, and judgment was entered accordingly. This is a companion case to *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989). The cases were tried separately, and the evidence presented, the theories of the prosecution, certain aspects of the theories of the defense, and the issues submitted to the juries differed in the two cases. In his appeal to this Court, defendant brings forward numerous assignments of error relative to the guilt-innocence phase of his trial. Having performed a careful and thorough review of the record, we conclude that defendant received a fair trial free of prejudicial error.

The State's evidence tended to show that the victim, Vickie White Calhoun, was standing in the living room of her home around 9:10 p.m. on the night of 17 March 1987 when a bullet came through her front window and struck her in the chest, killing her. She

and her husband lived on Tobaccoville Road in Rural Hall, a community in northern Forsyth County, and this was one of several shooting incidents that occurred in the county that night. The Forsyth County Sheriff's Department received reports of nine shooting incidents in all, five of which were accounts of shooting into occupied residences.

The neighboring house on Tobaccoville Road was the residence of Lena Cain, which was about 250 yards from the Calhoun house. Mrs. Cain testified for the State that she was in her living room watching television around 9:12 p.m. when she heard a noisy car drive past her house. Shortly thereafter, a shot came through the storm door and struck a picture on the wall. She then called the Sheriff's Department.

Geraldine McBride and Peggy Golden testified for the State. Their homes were also located on Tobaccoville Road. Mrs. McBride testified that she and her son were driving to a convenience store around 8:30 p.m. on the night of 17 March when they ran out of gas at Mrs. Golden's house, approximately one-half mile from the Cain residence. While Mrs. McBride's son was seeking a telephone, Mrs. Golden joined Mrs. McBride in her car on the road where it had stalled. Oncoming cars were forced to pull into the other lane of traffic to pass Mrs. McBride's vehicle. A few minutes later, while the two women were standing in the road beside the disabled car, Mrs. McBride heard the sound of one gunshot. Mrs. Golden heard two shots about ten seconds apart. The women then testified that a car approached them a few seconds after they heard the gunshots, traveling slowly as it passed them in the opposite traffic lane. Mrs. McBride described the car as a light-colored, medium-sized, four-door vehicle with vertical taillights. When Mrs. McBride was later shown a picture of the Plymouth Valiant defendant had been a passenger in that night, she confirmed that its taillights matched the ones she had observed. She further testified that the car made more noise than it should for the speed it was traveling. She described the passenger in the front seat as a person with "brown bushy, shaggy hair."

The State also presented testimony from Robert Rouch, a truck driver who was traveling north on Highway 52 that night. As he approached the third exit leading to Rural Hall, the Westinghouse Road overpass, he saw a medium-sized vehicle stop on the bridge above his traffic lane. Westinghouse Road merges into and becomes

Tobaccoville Road. As Rouch approached the exit, a shot was fired from the vehicle on the bridge, and the bullet lodged in Rouch's windshield. Rouch transmitted an alert over his citizens band radio and got a reply from Douglas Sells, a fellow truck driver who was at a nearby truck stop. Sells testified that he saw a car near the bridge contemporaneously with the shooting. When he first noticed the car, it was headed toward the bridge. Shortly thereafter, he heard a loud shot and immediately heard Rouch's urgent message. He jumped into his cab. He then saw a car—which he described as being medium sized, shaped like a box, and pale blue in color— pass him going in the direction of Rural Hall. The engine made a loud, sputtering sound.

The State's ballistics evidence tended to show that defendant purchased a revolver from a man named Eddie White on the day before the shootings, 16 March. This gun, the bullets taken from the victim's body and the Cain residence, and a cartridge casing found at the bridge overpass were sent to the State Bureau of Investigation crime lab. There it was determined that the bullets from the victim's body and the Cain house were not fired from the gun which defendant had bought on 16 March. Nor was the spent cartridge casing from this particular gun. The State countered these findings with testimony from an acquaintance, Sheila Marshall, that defendant had another gun, a silver automatic pistol, in his possession earlier on the day of the shootings.

Eddie White testified for the State that he saw defendant on the night of the shootings at approximately 6:00 p.m. Defendant asked White where he could buy bullets for the gun that White had sold him, and White recommended the K-Mart on Peters Creek Parkway in Winston-Salem. White further testified that he saw defendant the next morning, and defendant bragged about the fact that he had gone target shooting the night before. White testified that defendant stated that he had been in Rural Hall at some point during the course of the evening, although he admitted on cross-examination that he had failed to include this piece of information in his initial handwritten statement to the authorities.

Raleigh Wright, a fellow inmate at the county jail at the time defendant was awaiting his trial, testified that defendant had confided in him that he was guilty and that he owned both an automatic pistol and a revolver on the night of the shootings.

STATE v. BREWER

[325 N.C. 550 (1989)]

State's witness Donald Stout was a codefendant who entered into a plea arrangement in which the State dismissed his murder charge in exchange for his testimony. He provided eyewitness testimony that defendant fired between ten and fifteen shots over the course of the evening from the front passenger seat of a light blue 1972 Plymouth Valiant owned and driven by Lillian Thomas. Stout and three children were the remaining passengers in the car.

Stout testified that he had known defendant for two months prior to 17 March. On that night, at approximately 8:00 p.m., Stout was at Dunkin' Donuts on Peters Creek Parkway in Winston-Salem when defendant asked him if he wanted to "go party." He then joined defendant, Lillian Thomas, and the three child passengers in Lillian Thomas' car. According to Stout, Lillian Thomas purchased marijuana in Rural Hall shortly before 9:00 that evening. Shortly after the three adults finished smoking three marijuana cigarettes, Stout heard a gun discharge and what sounded like a bullet ricocheting off a metal sign. He looked up to see defendant aiming a gun out of the car window. Stout noted that defendant continued shooting a pistol out of the passenger window of Thomas' car for approximately an hour. During this hour, defendant fired twelve to fifteen shots at several houses, at a truck from the Westinghouse Bridge overpass on Highway 52, at an R.V. trailer court, and at numerous stores. In response to the State's request, Stout identified a picture of the Kye residence and testified that Thomas had pulled into the Kye driveway and that defendant had then fired a shot at the house. Stout then testified that defendant had shot at the McGee residence, which he recognized by the satellite dish in the front yard. Most significantly, Stout identified the Calhoun residence from a photograph and stated definitively that defendant "aimed for the lights" as instructed by Lillian Thomas when shooting at this and other houses. He recognized two distinguishing characteristics of the Calhoun home: a stone facade and a round stained glass window.

Defendant testified in his own behalf. His underlying defense was alibi. He asserted that he was not in Rural Hall on the night of the fatal shooting, but was in fact in another part of the county, on Highway 150 between Winston-Salem and Kernersville. When the car was just outside the city limits of Winston-Salem, he pulled a revolver out of his jacket pocket and emptied all five rounds into a street sign. Defendant testified that there were houses in the area, but that they were set back from the road and none

of them were in his line of fire. On the way back to Winston-Salem from Kernersville, defendant again shot at a street sign. There were no houses around; in fact, there was only a lake on the right-hand side of the road. He denied telling Eddie White or Raleigh Wright that he had done the shooting in Rural Hall. Acquaintances who had seen defendant or his companions at various times over the course of the evening also testified for the defense.

[1] Defendant argues thirteen assignments of error. He first contends that the trial court improperly excluded evidence which was relevant to the issue of whether defendant was the person responsible for the death of Vickie Calhoun. Defendant contends that this evidence tended to corroborate his theory that the person who perpetrated the crime was riding in a small white "Honda-like" hatchback vehicle with a red stripe, wraparound taillights, and a third brake light in the back window. It is undisputed by both parties that the underlying theory of the case is that several, if not all, of the shootings which occurred on the night of 17 March were likely to have been committed by a single person or group of persons. The State points to defendant as the perpetrator; defendant's theory is that someone else — a gunman in a small white vehicle — was responsible for the shootings.

Defendant's theory was primarily presented through the testimony of four witnesses. The first of these witnesses was Bobby Kye. He lived on Ridge Road, about four hundred yards off Tobaccoville Road. He was in his living room watching television just before 9:00 p.m. when a car pulled into the driveway next door, sat for a few seconds, and then backed out and drove toward Tobaccoville Road. A few minutes later a different car pulled into his driveway. When Mr. Kye walked to his window to view the car, it backed out of his driveway and sat on the road facing Tobaccoville Road. Kye observed that the car had a short wheel base, the size of a Honda or Toyota. It had taillights that wrapped around to the side of the car and a third brake light in the rear window. Kye then heard a gunshot. He stepped back from the window and glanced out of his storm door. The car had pulled up three to four feet but was still at the end of the driveway. Kye later had the opportunity to view Thomas' impounded vehicle and confirmed that this was not the car he had seen on the night of 17 March because it did not have the same "light structure."

Numa and Angie McGee also testified for the defense. They were residents of Rural Hall who lived on Edwards Road. The road on which the victim resided, Tobaccoville Road, becomes Broad Street in downtown Rural Hall. Edwards Road intersects with Broad Street. The McGees testified that about 9:15 p.m., on the night of 17 March, they heard a siren and turned on their police scanner, which reported a shooting on Tobaccoville Road. They then looked out of their living room window and saw three cars drive past their house. The first car was a dark grey color, the second was a small white car, and the third was a marked Sheriff's patrol car. A few minutes later, the Sheriff's vehicle again drove past their house in the opposite direction. Shortly thereafter, the other two cars followed. The McGees then heard a shot. Mr. McGee testified that he saw a person leaning out of the passenger window of the small white car, pointing a rifle towards Mr. McGee's brother's house next door. He could not tell if the person was a man or a woman. Both cars were brightly lit by a street light. McGee then called the Sheriff's Department. A minute later, his brother called and reported that the shot had gone through the wall of his mobile home.

The fourth witness to testify regarding defendant's theory that a small white car was involved in the Calhoun shooting was Deputy R. E. Carpenter, the officer who responded to the reports of shootings at the Kye and McGee homes. He corroborated each story, repeating the descriptions that were given to him by both Bobby Kye and Numa McGee.

Defendant claims that there were additional incidents about which the trial court excluded testimony that would have tended to further corroborate testimony already given and would also have more completely tied together his theory of the case.

The trial court excluded evidence concerning an incident which occurred at the Quality Mart, a convenience store in the neighboring community of Stanleyville. Two employees were called to testify. The trial court conducted a voir dire hearing to consider the evidence presented and concluded that the State's objection to the evidence should be sustained on the grounds of irrelevancy. The store clerks testified on voir dire that a man came into the store on 17 March between approximately 9:45 and 9:55 p.m. and demanded to use the telephone. When this request was denied, he became verbally abusive and was asked to leave. As he was leaving, he asked the

store clerks whether they were interested in getting his license tag number now or later, and he told them that they would read all about him in the newspaper the next day. He then got into the passenger side of a small grey or white hatchback vehicle with a red stripe down the side and a third brake light in the rear window. The car drove away in the direction of Rural Hall.

Numa McGee testified on voir dire that Deputy Carpenter told him that the small white car he had identified had been eliminated by the Sheriff's Department because the car had previously been stopped that evening in response to Kye's description, and it had been discovered that the driver of the car was a deputy's son.

Deputy Carpenter also testified on voir dire that immediately after he had departed the McGee residence that evening, he had pursued a small white Honda on Edwards Road around 10:00 p.m. during the course of a chase, but had wrecked his car in a curve during the pursuit. He stated that reports from other officers indicated that the car he had been pursuing belonged to the deputy's son and was the car that had been stopped earlier in the evening.

The trial court excluded the above evidence on the ground that it was not relevant to this proceeding. Defendant contends that this was error, stating that under Rule 401 of the North Carolina Rules of Evidence, evidence which points to the guilt of another is relevant to the critical issue of whether defendant committed the offense with which he is charged. He argues that the excluded evidence meets the requirements of Rule 401 in that it has the tendency to make the existence of a fact that is of consequence to the determination of the action—that is, that defendant was the perpetrator of the crime—less probable than it would be without the evidence. N.C.G.S. § 8C-1, Rule 401 (1988). Further, defendant claims that the excluded evidence goes beyond mere conjecture or speculation.

Defendant relies primarily on the recent case of State v. McElrath, 322 N.C. 1, 366 S.E.2d 442 (1988), to support his contentions. McElrath was a case based solely upon circumstantial evidence in which the defendant was given the opportunity to introduce a map into evidence to prove his claim that his son-in-law was murdered by his fellow companions in a car in which he was seen riding that day, possibly as a result of a failed larceny scheme. The McElrath Court, citing Rule 401, granted a new trial as the

STATE v. BREWER

[325 N.C. 550 (1989)]

result of the exclusion of this evidence tending to implicate others in the victim's death.

Defendant claims that the entire scheme of his theory, properly presented, would have established that nine shootings occurred that night within approximately a forty-five-minute time period and in a geographical pattern indicating that a single person or group of persons was likely to have committed all of the shootings. It is defendant's contention that this evidence, as in *McElrath*, "casts doubt upon the State's evidence that defendant was the killer and suggests instead an alternative scenario for the victim's ultimate demise." *McElrath*, 322 N.C. at 14, 366 S.E.2d at 450.

The State agrees that evidence that another committed the crime for which defendant is charged is relevant and admissible if it does more than create an inference or conjecture in this regard. The State contends that it has been well established by this Court that such evidence must point directly to the guilt of some specific other person or persons. *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981); *State v. Allen*, 80 N.C. App. 549, 342 S.E.2d 571, *disc. rev. denied*, 317 N.C. 707, 347 S.E.2d 441 (1986). We agree. The trial court based its rulings on its interpretation of this Court's decision in *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277 (1987). The defendant in that case was charged with rape and burglary. Defendant introduced evidence that two other break-ins and sexual assaults were committed in the same manner, on the same night, and near the site of the crimes for which he was charged. The victim of one of the other attacks identified a person other than defendant as the perpetrator. In all three instances it was reported that a light-skinned black male entered the rear of the home and exclaimed, "[h]ey baby," before assaulting her. Although this Court held that the admissibility of evidence of the guilt of one other than the defendant is now governed by the general principle of relevancy, the Court reiterated the rule that such evidence must point directly to the guilt of another specific party and must tend both to implicate that other party and be inconsistent with the guilt of the defendant. *Cotton*, 318 N.C. at 667, 351 S.E.2d at 279-80. *See generally* 1 Brandis on North Carolina Evidence § 93 (2d rev. ed. 1982).

In the case *sub judice*, even viewing the excluded testimony in the light most favorable to defendant, it cannot be said to give rise to more than mere speculation and conjecture of a type which

has been excluded consistently under Rule 401. Defendant contends that the exchange between the clerks at the Quality Mart in Stanleyville and the man in the small white car took place at approximately 9:55 p.m. He further contends that Deputy Carpenter questioned Numa McGee about his observations until about 9:58 p.m., at which time the deputy called in the description given by McGee and received the response excluded by the trial court that the described vehicle had been eliminated as a suspect. Defendant goes on to explain that there is a shortcut road between Highway 66, on which the Quality Mart is located, and Edwards Road, Numa McGee's address. Deputy Carpenter's excluded testimony concerning a car chase involving a white Honda at 10:00 p.m. would have placed the two cars on this back road. Defendant contends that placing these events in geographical and temporal proximity to one another gives them the credibility they need to rise above mere speculation and conjecture. We disagree.

Defendant's scenario is faulty with respect to one significant issue: it fails to point to a specific other person as the perpetrator of the crime with which defendant is charged — the murder of Vickie Calhoun. The most that the excluded evidence tends to establish is that there were two discrete events which took place that night which may or may not have had anything to do with one another and which, more importantly, may have had nothing to do with the crime in question. Defendant speculates that it is possible that the car that was observed by the clerks at the Quality Mart in Stanleyville was the same car that Deputy Carpenter chased on Edwards Road later in the evening. Defendant presented no evidence that the car that left the Quality Mart traveled the entire distance to Rural Hall and then turned right onto Edwards Road. Further, defendant's only hypothesis regarding the identity of the driver of the white car is that it may have been the deputy's son. This tenuous theory is based only upon the fact that the deputy's son's car was detained a couple of times by Sheriff's deputies over the course of the evening because his car was similar to the description given by Bobby Kye regarding the car he had observed. Defendant attempts to bolster this hypothesis through the testimony of Numa McGee that Deputy Carpenter dismissed another deputy's son's vehicle as being the suspect car, despite McGee's conviction that this was indeed the car to focus on.

Defendant's attempt to tie these threads together to point to one particular individual as the perpetrator of the Calhoun killing

unravels, however, when other facts are considered. On the one hand, defendant would have us believe that the person driving the car that Deputy Carpenter chased was another deputy's son. On the other hand, however, defendant is attempting to show that the car involved in the chase was the one that had earlier been observed at the Quality Mart. Significantly, the license plate observed and recorded by the clerks at the Quality Mart, the first three initials of which were "A R E," did not match the license plate of the deputy's son's vehicle, which was "BRW 7039." The fact remains that the only thing that ties the incident at the Quality Mart and the car chase together is the geographical and temporal proximity of the two events. Not only is defendant's excluded evidence irrelevant, but it also confuses the issues involved in violation of Rule 403. One must engage in conjecture and speculation to give the two incidents the kind of significance defendant wishes to attach to them. Even if one assumes that the two events were somehow related and that the white cars were indeed one and the same, this assumption in no way leads to any kind of conclusion that this vehicle must be the same one observed by Numa McGee or Bobby Kye.

Additionally, while both McGee and Kye saw or heard a gun, there was no indication that a gun was present in either of the other two incidents, and while one could argue that the description given by the clerks at the Quality Mart was similar to the description of the person observed by Numa McGee, it is apparent that McGee's description of the driver is vague and inconclusive and could describe any of a number of people. He did not even know if he observed a woman or a man. One of the Quality Mart employees testified further on voir dire that two detectives later visited the store and asked her to view a vehicle they had pulled over on Highway 66. She remembered the car as being a white Honda. The detectives requested that she look at the two men and one woman inside the car to determine if she could identify any of them. While she observed that one of the men had reddish-blond hair, she concluded that he was not the man who had approached her at the convenience store. Defendant engages in mere speculation in tying the two events together.

It requires an even greater leap of logic to place this or any white car in the proximity of the Calhoun residence at the time Vickie Calhoun was killed. The possibility that a passenger in a small white car may have been responsible for killing Vickie Calhoun

requires the sheerest of speculation and conjecture, and is not supported by either substantial or insubstantial evidence. The events defendant seeks to submit to the jury occurred some forty to fifty-five minutes after the Calhoun killing. There is simply nothing in the record to indicate that the perpetrator of this offense was a passenger in a small white car. The holding in *State v. Britt*, 42 N.C. App. 637, 257 S.E.2d 468 (1979), is instructive as to this issue:

> Evidence which tends to show nothing more than that someone other than the accused had an opportunity to commit the offense, without tending to show that such person actually did commit the offense and that therefore the defendant did not do so, is too remote to be relevant and should be excluded.

*Id.* at 641, 257 S.E.2d at 471. *See also* Torcia, *Wharton's Criminal Evidence* § 134 at 576 (14th ed. 1985) (Evidence of another person's motive or opportunity may be considered only if that person has been linked to the commission of the crime. Remote conduct of another person, not connected with the crime itself, may not be shown.).

Defendant argues that the jury should be allowed to determine whether the events are sufficiently similar to tie them together and that the weight of Numa McGee's testimony in comparison to the description given by the Quality Mart employees is to be decided by the triers of fact. We disagree. Defendant must first cross that threshold hurdle of relevancy when presenting evidence tending to inculpate another: he must present evidence which not only serves to exculpate himself, but also serves to inculpate another in the offense for which he is charged. He has failed to overcome either burden. Although the *Cotton* case established that the general standard of relevancy under Rule 401 would be applied to cases such as this, it did not change the established policy that such evidence must point directly to the guilt of a specific third party. *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277. Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible. *State v. Hamlette*, 302 N.C. 490, 276 S.E.2d 338 (1981); *State v. Stanfield*, 292 N.C. 357, 233 S.E.2d 574 (1977).

It is important to distinguish *State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442, from the case at bar. The State's case in *McElrath* rested solely upon circumstantial evidence. In that case, defendant successfully argued that his proffered evidence tended both to implicate another specific group of individuals as the perpetrators

and to be inconsistent with his own guilt. Unlike *McElrath*, however, this case is not a "very close case in which there is only circumstantial evidence identifying this defendant, to the exclusion of other persons, as the perpetrator." *Id.* at 14, 366 S.E.2d at 450. The State has presented a significant amount of both direct and circumstantial evidence inculpating defendant.

Assuming *arguendo* that defendant's proffered evidence was erroneously excluded, however, such error was not sufficiently prejudicial to warrant a new trial. Defendant has not carried his burden of showing a "reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1988). Not only did the State present ample evidence to support its theory of the case, defendant was able to present his hypothesis to the jury through testimony to the same effect from witnesses Bobby Kye, Numa and Angie McGee, and Deputy Carpenter.

From substantial evidence introduced at trial, the jury could and apparently did believe that a medium-sized, four-door, light-colored, noisy car, with taillights identical to those of the light-blue, four-door Plymouth Valiant defendant was riding in that night, was present when the shots were fired at the overpass and shortly thereafter at the Calhoun and Cain residences on Tobaccoville Road. The evidence showed that shortly before Vickie Calhoun was shot, Robert Rouch observed a vehicle which fit the description of Thomas' car on the Westinghouse Road bridge. Donald Stout testified that the Thomas vehicle was indeed on the overpass and that defendant shot at a truck. Doug Sells' description of the car that left the bridge, drove down the road, and passed him was very similar to that of the Thomas vehicle. Stout testified that the Thomas vehicle then passed the Calhoun house, at which time defendant fired a shot into the residence. Geraldine McBride testified that she heard the shot and identified the taillights of the vehicle that passed her on Tobaccoville Road immediately thereafter.

There was no evidence placing a small white car near the Calhoun residence at the time Vickie Calhoun was killed. Moreover, Donald Stout directly implicated defendant as the person who shot at the Calhoun residence. Raleigh Wright corroborated Stout's testimony in his recounting of what defendant had confided to him. The State's evidence both directly and circumstantially pointed to defendant as the perpetrator of the offense. The excluded evidence

did not cast any real or substantial doubt upon the State's evidence that defendant fired the fatal shot.

Defendant was able to present the bulk of his theory through the eyewitness testimony of three of his witnesses and the corroborative testimony of a fourth. Bobby Kye testified in great detail regarding what he witnessed the night of 17 March, as did Numa and Angie McGee. All described a small white car, in the shape of a Honda or Pinto, with a red stripe on the side, wraparound taillights, and a third brake light in the rear window. Numa McGee testified that he saw a person with brown shaggy hair hanging out of the passenger side, pointing a rifle at his brother's house. Deputy Carpenter corroborated each account by recounting what Kye and McGee had told him. The State's cross-examination was thorough, but failed to shake the conviction of any of defendant's witnesses regarding what they saw and heard that night. We therefore conclude that the trial court did not err in excluding defendant's proffered evidence and that even if we assume error, such error was harmless. This assignment of error is overruled.

[2] Defendant's second and third assignments of error concern the trial court's decision to allow the State to question and argue the absence of codefendant Lillian Thomas and defendant's son, Jonathan Martin, as witnesses at defendant's trial. Thomas was driving the Plymouth Valiant on the night in question, and Jonathan, who was then six years of age, was a passenger. Defendant contends that the trial court's decision was prejudicial because the prosecutor's comments and arguments were misleading to the jury.

Defendant testified in his own defense. During the State's cross-examination, he was twice asked whether he had subpoenaed Thomas to trial and whether she would be a witness for him. The trial court sustained defendant's objections to each question, but denied defendant's motion for mistrial and his motion *in limine* requesting the court to instruct the State to refrain from any further references to Thomas' absence.

During its argument to the jury, the State argued that defendant's failure to call his son and Thomas as witnesses implied that they would contradict his testimony:

Now, you know, they want you to accept their three eyewitnesses, the McGee's [sic] and Bobby Kye, and say ours are mistaken. But, you know, *there were some other eyewitnesses out there that night.*

> *They were the other people in the car. Now where are*
> *they? Where is the defendant's son? Where is the driver of*
> *that automobile? Now, wouldn't they know what went on?*
> You know, now, when you give the State a fair trial, members
> of the jury, this is the kind of thing I'm talking about. And
> you can't expect us to reasonably call the defendant's son
> and have the defendant's son tell on him. But I submit to
> you that the defendant should be able the [sic] call his son.

MR. ELLIOT: Object.

THE COURT: Well, sustained. Don't hear any more about it.

MR. SAUNDERS: Now, I don't know that we should be
expected to call the driver of the car, either.

MS. GELBIN: Object to that.

THE COURT: Overruled.

MR. SAUNDERS: Somebody should have put her up there
and let her be cross examined. Because she was an eyewitness,
too.

(Emphasis added.) Defendant contends that this argument misled
the jury, and that the trial court's failure to prevent such argument
violated this Court's admonition in *State v. Miller*, 288 N.C. 582,
220 S.E.2d 326 (1975):

> It is the duty of the trial court, upon objection, to censure
> remarks not warranted by either the evidence or the law,
> or remarks calculated to mislead and prejudice the jury.

*Id.* at 599, 220 S.E.2d at 338. Although the court recognized preju-
dice to defendant in its rulings and in its admonishment to the
prosecutor in his closing argument, defendant argues that the trial
court improperly refused to instruct the jury as to the meaning
of its rulings, that is, that defendant's son and Thomas were
unavailable as a matter of law and that the jury should not consider
their absence in its deliberations. Defendant contends that it is
obvious that the purpose of the argument was a bad faith attempt
to encourage the jury to believe that if Thomas and defendant's
son had testified, they would have contradicted defendant's
testimony, when in fact the State was well aware of the fact that,
according to defendant, Thomas' substantive testimony at her earlier
trial entirely exculpated defendant and that his son Jonathan testified
equally favorably to defendant in his voir dire hearing.

The State denies that it acted in bad faith and contends that in order for the prosecutor's questions to be deemed improper, it must appear on the face of the record that such questions were asked in bad faith. *State v. Dawson*, 302 N.C. 581, 276 S.E.2d 348 (1981). Although Thomas' trial testimony was that she had not been in the Rural Hall area on the night of 17 March 1987, she had earlier given investigating officers directions as to the route she drove on the night of the shootings and had specifically pointed out the residences in Rural Hall, including the Calhouns' home, into which defendant shot. Given Thomas' prior incriminating statements which contradicted her trial testimony, as well as the jury's verdict finding her guilty, the State claims that it did, in fact, have a good faith basis for raising and arguing the fact of Thomas' absence as a witness. The State further relies upon this Court's holding in *State v. Tilley*, 292 N.C. 132, 232 S.E.2d 433 (1977): "The State may fairly draw the jury's attention to the failure of the defendant to produce exculpatory evidence or to contradict the State's case." *Id.* at 143, 232 S.E.2d at 441. "Ordinarily, the argument of counsel is left largely to the control and discretion of the presiding judge, and counsel is allowed wide latitude in the argument of hotly contested cases." *State v. Miller*, 288 N.C. 582, 598, 220 S.E.2d 326, 338.

With regard to Thomas' testimony, defendant requested that the court instruct the witnesses that no references were to be made to evidence adduced at Thomas' trial and that they were not to mention her presence. A similar request was granted in defendant's first trial, but at this proceeding the judge merely said, "I would caution each side to be cautious about that aspect of the trial." He did not in fact rule on the request for instruction. Defendant now claims that Thomas was unavailable as a witness because, as her appeal was then pending, she had a constitutional privilege not to testify while her fate also hung in the balance. The trial court stated, and we agree, that it was Thomas' responsibility to affirmatively exercise her privilege and that until such time, she was subject to the court's jurisdiction and could be called upon to testify. We note, however, without deciding the point, that many jurisdictions and commentators support the proposition that no inference arises adversely to defendant if the person not called as a witness by the defense is a codefendant or accomplice or has already been convicted of the same offense as that for which defendant is being prosecuted. Torcia, *Wharton's Criminal*

*Evidence* § 88 at 273-75 (14th ed. 1985). Any possible impropriety in raising such an inference in this case, however, must necessarily be deemed harmless in light of the court's curative actions in promptly stopping any questioning of defendant as to the failure to call Thomas and defendant's son and in cutting off the prosecutor's jury argument in that regard.

Defendant further contends that while it is true that a prosecutor may comment upon the failure of a defendant to call an available and material witness whose testimony would ordinarily be expected to favor the defendant, it must appear from the evidence that the absent witness was *competent* to testify before any inference may be asserted against the noncalling party. Defendant filed a motion *in limine* requesting that his son Jonathan, who was seven years old at the time of trial, be ruled incompetent as a witness. The trial court deferred any ruling pending a voir dire hearing. Although Jonathan testified consistently and favorably to defendant, the court excluded his testimony at the voir dire hearing pursuant to Rule 403. The court felt that due to Jonathan's young age, he was apt to confuse the facts regarding where Thomas' vehicle was on the night in question and whether his father was in fact shooting at signs or at houses that night, and thus his testimony would have no probative value for the State. Defendant claims that the State's references and argument incorrectly and improperly implied that Jonathan was available as a witness, an inference which was inconsistent with the court's ruling on the matter. Examination of the record reveals that during a conference among the attorneys for both sides and the trial judge, the judge confirmed the prosecutor's assumption that although the judge had ruled that Jonathan's testimony had no probative value for the State, it did not follow from that ruling that Jonathan could not be called as a witness. Although this Court has never decided the question, and need not do so here, other jurisdictions have held that it must appear from the evidence that the absent witness was competent to testify before any inference may be asserted against the noncalling party. *See, e.g., State v. Francis*, 669 S.W.2d 85 (Tenn. 1984).

Although we agree with defendant that the State's attempted cross-examination and jury argument with regard to both individuals were inappropriate, we are unable to conclude that the trial court erred in its response. Defendant's objection to the State's line of questioning was promptly sustained, and this Court has held

that the mere asking of a question, followed by a sustained objection, is not prejudicial to a defendant. *State v. Whisenant*, 308 N.C. 791, 303 S.E.2d 784 (1983) (citing *State v. Campbell*, 296 N.C. 394, 250 S.E.2d 228 (1979)). Regarding the inappropriate subject matter in his closing argument, the court promptly admonished the prosecutor, "[d]on't hear any more about it." No curative instruction was necessary, as the import of the court's remark was clear and unequivocal. *State v. Watson*, 294 N.C. 159, 240 S.E.2d 440 (1978). Even assuming *arguendo* that such isolated remarks by the prosecutor were error, their impact on the jury was not proven by defendant to be prejudicial. The direct and circumstantial evidence against defendant was substantial and indeed compelling, and in the context of such evidence, there is no reasonable possibility that had the alleged error not been committed, defendant would have been found not guilty. *State v. Miller*, 288 N.C. 582, 220 S.E.2d 326.

[3] Defendant's next assignment of error concerns the trial court's admission of testimony from James Calhoun, husband of the decedent, regarding the reason why he gave reward money to State witness Donald Stout. During direct examination of Mr. Calhoun, the State asked him why he had been willing to give Stout reward money, and Calhoun answered, over defendant's objection, "[b]ecause I believe that he was trying to help and he still is." Defendant again objected and moved to strike the response, and the trial court instructed the jury as follows:

> Now, you can consider what he believes the reason why he gave money, not whether Stout could help him or not; but just the belief that he gave it to Stout for that purpose.

Defendant contends that Mr. Calhoun's answer constituted an improper opinion as to Stout's credibility and that because Stout's credibility was crucial to the State's case, the trial court committed prejudicial error in admitting the testimony and in failing to strike it. We disagree. Mr. Calhoun's statement could only be perceived as a comment reflecting his belief and hope that the information provided by Donald Stout would be instrumental in convicting the person who took his wife's life. Our review of the trial transcript reveals that Mr. Calhoun offered the reward in the hope of obtaining the name of a witness and the location of the murder weapon. The reward could in no way be interpreted as a testimonial to Stout's credibility and good character. Furthermore, the jury was

properly instructed as to the proper inference to be given to Calhoun's testimony. His statement qualified as proper lay opinion because it was "rationally based on the perception of the witness" and was helpful to an understanding of his testimony, as required by N.C.G.S. § 8C-1, Rule 701 (1988). The trial court's actions were appropriate, and we find no error in them.

[4] Defendant next contends that the trial court erred in excluding defendant's evidence regarding his state of mind, which was offered to refute the State's theory that defendant fled the state because he learned he was a suspect in the case. Defendant argues that he should have been permitted to present the testimony of himself and others which would have shown that he did not know he was a suspect and that his demeanor and conduct were inconsistent with that of a person on the run. Defendant specifically contends that the trial court erred in precluding his cousin, Glenda Byrd, and employer, Terry Reynolds, from testifying that during his stay in Tennessee he did not appear to be concerned about anything and that he even waved at a sheriff's car when it passed his cousin's house. The court also excluded testimony that on the night of his arrest, defendant was aware of the presence of plainclothed police officers but he did not act nervous. Our review of the trial transcript reveals that defendant, apart from this proffered testimony, did in fact present ample evidence in his effort to refute the State's theory of flight. He testified that he left North Carolina with the intent to permanently stay away because he was homesick and depressed about the fact that his relationship with his girlfriend had ended and also because he wanted to turn himself in to Tennessee authorities because of a former parole violation. He further testified that he had been planning to leave North Carolina for approximately a month prior to his departure. He took advantage of several opportunities to bring out the information he now contends it was error to exclude and in fact was able to present much of the evidence excluded in the examination of Ms. Byrd through the testimony of Mr. Reynolds, including the assertion that during defendant's two-week stay, he never said "anything about having any troubles in Winston-Salem." We find no error in this assignment.

[5] Defendant's next assignment of error concerns the trial court's exclusion of a portion of the transcript of Donald Stout's testimony at the earlier trial of Lillian Thomas. Defendant's purpose in seeking to introduce this testimony from the transcript was to impeach

Stout with an allegedly inconsistent statement he previously made under oath regarding what roads he was familiar with. While it is true that former testimony may be used to impeach a witness while he is presently testifying, we find that, in this case, evidence to the same effect was otherwise admitted. The record covering defendant's cross-examination of Stout is replete with defendant's references to Stout's prior inconsistent statements. In fact, Stout admitted on cross-examination that he had stated facts inconsistent with his present testimony in a prior proceeding. We conclude that defendant was afforded wide latitude in his cross-examination of Stout and in fact presented to the jury much evidence to the same effect. We find no error in the trial court's exclusion of a small portion of the earlier trial transcript.

[6] Defendant next assigns error to the trial court's decision to allow the prosecutor to question him and a defense witness concerning defendant's association with a character who had been convicted of murder and the fact that defendant was known to associate with "murderers." Defendant claims that this evidence was irrelevant and that the prosecutor's brief reference to it in his argument was improper and prejudicial. The State counters that defendant himself opened the door to questions about this man's past by referring on two occasions to the fact that defendant wanted to visit him on the night in question because the man "was supposed to be getting out on bond" and that the man's wife had "gone to . . . see about getting him out on bond." Not only did the court sustain defense objections to the prosecutor's line of questions, the court also instructed the jury that a defendant may not be convicted on the basis of something he may have done in the past. We agree with the State that the questions and the reference to their subject matter in the State's argument were nonprejudicial. This assignment of error is overruled.

[7] In his eighth assignment of error, defendant contends that the trial court erred in allowing the State to introduce photographs of codefendant Lillian Thomas and of defendant which were grotesque and unflattering. He claims that the showing of these photographs to the jury was prejudicial because Thomas' identity was not at issue and further claimed that the only illustrative purpose the pictures served was that of providing a contrast between defendant and Thomas on the one hand and Vickie and James Calhoun on the other. We disagree. We have examined the photographs in question, and while we find them to be less

than flattering, they cannot fairly be characterized as "grotesque." Defendant has made no showing that the photographs in question made the parties look different from the way they appeared in March 1987. In addition, both defense counsel in closing argument and the court in its charge admonished the jury that it was not to make its decision based on appearances or on sympathy. We conclude that the admission of these photographs was relevant to prove the identity of Thomas, the alleged driver of the car, and, as such, was not error.

[8] Defendant next claims that the trial court erred in prohibiting his counsel from impeaching State witness Raleigh Wright, defendant's acquaintance in prison, with a letter Wright had written to a federal judge during a prior incarceration requesting a reduction in his sentence. Defendant claims that such evidence tends to show that Mr. Wright knew how to manipulate the criminal justice system, a trait which would serve to lower his credibility with the jury. In reviewing the record, we believe that the excluded letter was merely cumulative and would not have significantly strengthened defendant's impeachment of Wright. Defendant extensively cross-examined Wright about his experience with the criminal justice system, specifically, his history of plea bargaining, in order to show Wright's possible bias and has failed to demonstrate how the omission of this evidence prejudiced him. We find no error in this assignment.

[9] Defendant's next two assignments of error concern his contention that the trial court failed to require the State and Raleigh Wright's attorney to disclose evidence favorable to the defense and that such failure was prejudicial to his case. He claims that certain sealed materials before this Court in the companion case, *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989), may reveal exculpatory evidence that was not disclosed to him in violation of the mandate in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963), and he requests that this Court conduct an independent review of the material to determine whether it contains favorable evidence tending to show that other vehicles were involved in the shootings or any evidence tending to support his theory of the case. N.C.G.S. § 15A-903 provides that when a defendant makes a specific request at trial for disclosure of evidence in the State's possession, the judge must, at a minimum, order an *in camera* inspection and make appropriate findings of fact, and if the judge rules against defendant, the evidence should be sealed and placed

in the record for appellate review. *State v. Voncannon*, 49 N.C. App. 637, 272 S.E.2d 153 (1980), *rev'd on other grounds*, 302 N.C. 619, 276 S.E.2d 370 (1981). Defendant additionally argues that the trial court improperly denied him access to the file of the attorney representing Raleigh Wright, which defendant hoped would assist him in impeaching Wright. Defendant argues that because Wright testified, he had waived his right to the attorney-client privilege. However, neither the statutory provisions set out in N.C.G.S. § 15A-903 nor waiver of the attorney-client privilege alters the general rule that the work product or investigative files of the district attorney, law enforcement agencies, and others assisting in preparation of the case are not open to discovery. *State v. Alston*, 307 N.C. 321, 298 S.E.2d 631 (1983). *See* N.C.G.S. § 15A-904 (1988). Internal police reports and memoranda prepared by law-enforcement officers are not made discoverable by this statute. *State v. Bruce*, 315 N.C. 273, 337 S.E.2d 510 (1985). We also note that where the witness on the stand does not utilize the writings sought to be produced, even though the writings are under his control, as was the case with Raleigh Wright's attorney, opposing counsel cannot compel their production. *State v. Jackson*, 302 N.C. 101, 273 S.E.2d 666 (1981).

The record shows that the requested material was inspected by Judge Cornelius *in camera* and that certain materials were in fact provided to the defense. In accordance with the proper procedure, the remaining documents were sealed for appellate review. We have reviewed the materials under seal, and we do not discern any abuse of discretion in the exclusion of these documents. Defendant has failed to show any such abuse and is not now permitted to engage in a fishing expedition for exculpatory material.

[10] Defendant also assigns error to the trial court's refusal to instruct the jury on the offense of involuntary manslaughter, which he requested at the charge conference. The trial judge was persuaded by the State's argument that the verdict was limited to either first-degree murder or not guilty, and the jury was instructed accordingly. The State's theory for charging defendant with first-degree murder was that he had committed the offense of discharging a weapon into occupied property, a felony under N.C.G.S. § 14-34.1, and that such offense had resulted in the killing of Vickie Calhoun.

N.C.G.S. § 14-34.1 states, in relevant part:

Any person who willfully or wantonly discharges or attempts to discharge:

. . . .

(2) A firearm into any building . . . while it is occupied is guilty of a Class H felony.

N.C.G.S. § 14-34.1 (1986).

Defendant contends that he was denied due process of law because the trial court refused to allow the jury to consider the offense of involuntary manslaughter and denied his requested instruction on that offense. He contends that the jury could have accepted that portion of the State's evidence which indicated that he was at the Calhoun residence that night and some of his own evidence suggesting that he was only shooting at street signs and that a stray bullet killed Vickie Calhoun.

Before addressing this assignment of error directly, we must first dispose of a contention by the State which it contends disposes of the issue entirely. The State submits that even if we accept both its evidence and defendant's evidence in the light most favorable to the defense, there was no evidence of an *unintentional* discharge of the weapon such as to entitle defendant to a possible verdict of involuntary manslaughter. We find that the State's argument rests on the invalid premise that in order to entitle defendant to an instruction on involuntary manslaughter, the discharge of a weapon must necessarily be unintentional. This Court made it clear in *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978), that an *intentional* shooting at an object can amount to culpable negligence, which is one of the states of mind required for an instruction on involuntary manslaughter:

[W]hile involuntary manslaughter imports an unintentional killing, i.e., the absence of a specific intent to kill, it is . . . accomplished by means of some intentional act. Indeed without some intentional act in the chain of causation leading to death there can be no criminal responsibility.

*Id.* at 582, 247 S.E.2d at 918. The Court defined culpable negligence as an act or omission evidencing a disregard for human rights and safety. *Id.* at 579-80, 247 S.E.2d at 916-17. *See also State v. Ward*, 286 N.C. 304, 210 S.E.2d 407 (1974); *State v. McGill*, 314 N.C. 633, 336 S.E.2d 90 (1985). Involuntary manslaughter is defined

as "the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 153 (1976).

Having determined that the assignment is not disposed of because of a lack of evidence of an unintentional shooting, we now address the question of whether defendant was entitled to a charge of involuntary manslaughter on the evidence presented. Defendant contends that involuntary manslaughter is a lesser included offense of felony murder, and he was thus entitled to have the jury consider that offense. The relevant statute is N.C.G.S. § 15-170:

> Upon the trial of any indictment the prisoner may be convicted of the crime charged therein or of a less degree of the same crime, or of an attempt to commit the crime so charged, or of an attempt to commit a less degree of the same crime.

N.C.G.S. § 15-170 (1983).

This Court adheres to the rule that in a proper case where it is permissible under the indictment to convict defendant of a lesser included offense, the court must still determine that there is evidence tending to support the lesser offense in order to submit it for the jury's consideration. Upon a favorable determination of both issues, that is, that the crime is a lesser included offense and that there is evidence to support it, defendant is entitled to have the instruction on the lesser offense submitted to the jury. *State v. DeGraffenreid*, 223 N.C. 461, 27 S.E.2d 130 (1943). Here, there is no evidence to support the submission of involuntary manslaughter. Defendant contends that since the jury could have believed the State's assertion that he was at the Calhoun residence on the night of 17 March 1987, but also could have believed that portion of his testimony that he was intending to shoot only at street signs (although in an entirely different location), he is entitled to an instruction on involuntary manslaughter. We disagree.

In our review of this Court's previous holdings, we find that where a defendant's sole defense is one of alibi, he is not entitled to have the jury consider a lesser offense on the theory that jurors may take bits and pieces of the State's evidence and bits and pieces of defendant's evidence and thus find him guilty of a lesser

offense not positively supported by the evidence. In *State v. Allen*, 297 N.C. 429, 255 S.E.2d 362 (1979), the defendant denied he was the victim's assailant and introduced evidence to support his defense of alibi and mistaken identity. This Court held that a defendant is not entitled to rely on the possibility that the jury may believe only a part of the State's evidence as a ground for submission of a lesser offense. In that circumstance, there is no positive evidence of a lesser offense and the jury need only decide whether defendant was the perpetrator of the crime charged. *See also State v. Williams*, 315 N.C. 310, 338 S.E.2d 75 (1986); *State v. Hicks*, 241 N.C. 156, 84 S.E.2d 545 (1954). Our review of the trial transcript reveals that defendant's sole and unequivocal defense was that he was nowhere near the Rural Hall area on the night of 17 March 1987. He does not concede in any way that he might unknowingly have been near the Calhoun residence. We do not address the issue of whether, had there been evidence that defendant shot at a sign and the bullet accidentally ricocheted into the Calhoun home, an instruction on involuntary manslaughter would have been warranted. Defendant testified here that, in a totally different area of the county, he shot twice out of the car at street signs and that both times he was sure that no houses were in the vicinity.

The State's evidence is clear and unequivocal that defendant had the necessary specific intent to be convicted of the felony of discharging a weapon into an occupied residence. Although Donald Stout testified on direct examination that defendant had shot twelve to fifteen times at "quite a few houses" and a trailer court and that he "believed" that defendant shot a traffic sign because he heard a "ping," Stout's later testimony clarifies the events which subsequently occurred:

Q. Mr. Stout, let me show you what's been identified as State's Exhibit Number three and ask you if you can identify that, please, sir.

A. Yes, sir.

Q. And how can you identify State's Exhibit Number three?

A. Well, a shot was fired at the house. I looked directly at the house, as we were going right in front of it, the boulder wall there with stained glass window. I remember seeing the stain glass window.

. . . .

STATE v. BREWER

[325 N.C. 550 (1989)]

Q. Do you know whose house that is?

A. Yeah. The Calhoun house.

Q. And when the shot was fired at that house, who fired the shot?

A. Jackie Brewer.

Q. Any of these times that he was firing this gun, did the driver, Lillian Thomas, ever say anything to him?

A. Yes, sir.

. . . .

A. Why don't you aim for the lights.

Q. Did she say that at Mr. Calhoun's house?

. . . .

A. Yes.

Where the State's evidence is clear and positive as to each element of the offense charged and there is no evidence supporting a lesser offense, it is not error for a judge to refuse to provide instructions on that lesser charge. *State v. Peacock*, 313 N.C. 554, 330 S.E.2d 190 (1985); *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983). Because defendant limited himself to the defense that he was not in Rural Hall at any time that night, the jury's decision was limited to a factual determination of whether defendant was in Rural Hall shooting into houses, as the State contends, or whether he was in the vicinity between Winston-Salem and Kernersville shooting at street signs, as defendant asserts. We conclude that the two instructions that were given were proper and that an instruction on the offense of involuntary manslaughter was not warranted by the evidence. Defendant's assignment of error is overruled.

[11] Defendant's final assignment of error regards the trial court's decision to permit the State to argue in its closing argument matters which defendant contends were clearly calculated to prejudice defendant and elicit passion and sympathy for the victim. He first argues that the State improperly focused the jury's attention on emotional issues such as grief, anger, vengeance and sympathy, rather than the contested facts of the case. Secondly, he contends that the State's characterization of one of the defense witnesses as "a professional witness for the defendant" was not based on

the evidence. Finally, defendant argues that the trial court erred in allowing the State to read a principle of law concerning acting in concert which suggested that witness Donald Stout was not at risk of prosecution simply because of his presence in the car.

The State counters that defendant did not object to the prosecutor's remarks and that the argument was not so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. We agree. The standard of review is one of "gross impropriety." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). The prosecutor's argument, while inflammatory, was not improper to the point of being unduly prejudicial to defendant. Counsel is given wide latitude in the argument of hotly contested cases. Counsel may argue the law, the facts in evidence, and all reasonable inferences to be drawn therefrom. *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989) (citing *State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986) ). We note that defendant addressed these same matters in his argument to the jury. Not only did defendant admonish the jury in his closing argument not to decide the case based on sympathy, but he also elaborated on his interpretation of the legal concept of acting in concert. The court's instructions also included these themes. We find that there was no error in the trial court's failure to intervene *ex mero motu* in the prosecutor's argument.

We conclude that defendant received a fair trial free of prejudicial error.

No error.

Chief Justice EXUM concurring.

I believe it was error to exclude the testimony of the Quality Mart employees, Ruby Vaughn and Joan Overby, as well as the testimony of Deputy Carpenter regarding his pursuit of a small, white Honda CRX. Since much evidence of similar import was admitted, I see no reasonable possibility that there would have been a different result at trial had this evidence been admitted as well. I therefore concur in the result reached by the majority.

The excluded evidence was admissible for the same reasons that the testimony of Bobby Kye, Numa and Angie McGee was admissible and, indeed, was admitted at trial. The excluded evidence

tended to "cast doubt" on the State's case, *State v. McElrath*, 322 N.C. 1, 12, 366 S.E.2d 442, 448 (1988), and it also tended to show that someone other than defendant committed the crime. *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277 (1987).

State's witness Donald Stout testified that defendant shot at the Kye, Calhoun, Cain and Curtis McGee homes from Lillian Thomas' 1974 light blue, four-door Plymouth Valiant with vertical taillights and no third brake light in the rear window. Bobby Kye and Numa and Angie McGee testified that the shots fired at the Kye and Curtis McGee homes came from a small light-colored or white car with a sloped back, wraparound taillights, and a third brake light in the rear window.[1] Kye testified that the shooting at his home occurred between 8:55 and 8:58 p.m. The McGees' testimony indicated that the shooting at Curtis McGee's home occurred between 9:20 and 9:40. If, as both the State and defendant seem to argue, the person who shot at the Kye and McGee homes is the person who shot at the Calhoun home, the testimony of Kye and the McGees casts doubt on Stout's testimony that defendant was doing the shooting, and it points directly to someone other than defendant as being guilty of the Calhoun homicide.

The excluded testimony is of like import and tends to corroborate the testimony of Kye and the McGees. The two Quality Mart employees, Ruby Vaughn and Joan Overby, would have testified, had they been permitted, that a man with shaggy hair who was riding in a small white or silver car with a red stripe on the side, wraparound taillights and a third brake light in the rear window arrived at the Quality Mart in Stanleyville between 9:40 and 9:55. The man came into the store intoxicated and demanded to use the phone. When refused, he behaved rudely. When asked to leave, he inquired whether they wanted to get his license plate number now or later, and said they would be reading about him in the papers the next day. He then got back in the passenger side of the car and headed in the direction of Rural Hall.

The Quality Mart in Stanleyville is approximately three miles from the McGee residence, and two buildings across the road and adjacent to the Quality Mart also had shots discharged into them. Clearly, then, the incident at the Quality Mart was close temporally

---

1. These witnesses' testimony variously described the car or cars as small "Honda-like" or "Pinto-like" vehicles.

to the Kye and McGee shootings and close geographically to the sites of those shootings. The car in which the man was riding fitted the description of the car seen by Kye and the McGees. From this evidence the jury could conclude that the man seen at the Quality Mart was the man who shot at the Calhoun, Kye and McGee homes. This, consequently, is evidence tending to cast doubt on the State's case and to show someone other than defendant committed the Calhoun homicide.

The other evidence that was excluded was the testimony of Deputy Carpenter relating to a car chase that occurred shortly after the Quality Mart incident. Had he been permitted, Deputy Carpenter would have testified that he left the McGee residence at 9:58 after investigating the shooting there. He headed toward Rural Hall when he saw a small, white Honda CRX with a red stripe down the side and a third brake light in the rear window. Noting that it was similar to the car described to him by Bobby Kye thirty minutes earlier and by the McGees moments before, Deputy Carpenter turned around, activated his blue light, sounded his siren and pursued the Honda. The Honda did not respond to the blue light or siren. Deputy Carpenter continued the pursuit until his patrol car crashed in a curve about three-tenths of a mile past the McGee residence. The Honda drove out of sight up the dirt portion of Edwards Road into Stokes County.

Again, Deputy Carpenter's testimony tends to show that a car matching the description of the car observed by Kye, the McGees and the Quality Mart employees was in the area close to the time of the shootings, including the Calhoun shooting. This car fled from the deputy and did not respond to his flashing blue lights or siren. This car did not match the description of the car in which defendant was riding. A jury could reasonably conclude that this was the car from which the shots were fired at the Kye, McGee and Calhoun residences. Thus, Deputy Carpenter's testimony also tends to cast doubt on the State's case and points directly to the guilt of another party.

The excluded testimony was clearly relevant. Rule 401 provides:

"Relevant evidence" means evidence having *any tendency* to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

N.C.G.S. § 8C-1, Rule 401 (emphasis added). The use of the word "any" in the statute erects a very low relevancy threshold. "The relevance standard to be applied is relatively lax." *McElrath*, 322 N.C. at 13, 366 S.E.2d at 449. "[T]he standard in criminal cases is particularly easily satisfied. 'Any evidence calculated to throw light upon the crime charged' should be admitted by the trial court." *Id.*, quoting *State v. Huffstetler*, 312 N.C. 92, 104, 322 S.E.2d 110, 118, *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1984).

Evidence tending to point to the guilt of another is always relevant and admissible, provided that it "does more than create an inference or conjecture in this regard. It must point directly to the guilt of the other party." *Cotton*, 318 N.C. at 667, 351 S.E.2d at 279. "The admissibility of evidence of the guilt of one other than the defendant is governed now by the general principle of relevancy." *Id.* at 667, 351 S.E.2d at 280.

Evidence which "casts doubt upon such a fundamental part of the State's case—namely, that defendant was in fact the perpetrator of the crime" is relevant and admissible. *McElrath*, 322 N.C. at 12, 366 S.E.2d at 448.

As I have demonstrated, the excluded evidence both cast doubt upon the State's case against Brewer and pointed directly to the guilt of someone else. It was, therefore, relevant and admissible under Rule 401, *McElrath* and *Cotton*.

Though I believe the evidence was relevant and admissible, I do not believe its exclusion was reversible error. Defendant was able to present to the jury through the Kye and McGee testimony his theory that another person was responsible for the shootings. This testimony was based on the witnesses' observing a car immediately after shots were fired from it. If this evidence did not raise a reasonable doubt as to defendant's guilt in the minds of the jurors, I am relatively confident that the excluded evidence would not have succeeded in doing so. Indeed, the evidence excluded here was admitted in the companion case of *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989). Thomas, nevertheless, was found guilty of first degree murder on the theory that she, as the driver of the car, acted in concert with Brewer.

Justice MITCHELL concurring in result.

The majority holds that the trial court properly refused to instruct on the lesser offense of involuntary manslaughter, because

there was no evidence of involuntary manslaughter. For reasons which I have fully discussed in my dissenting opinion in *State v. Thomas*, 325 N.C. 583, 386 S.E.2d 555 (1989), involuntary manslaughter is not a lesser *included* offense of first-degree murder, when, as here, first-degree murder is submitted to the jury based *solely* upon the felony murder theory; this is true without regard to what the evidence may tend to show. *Because* the trial court — for whatever reason — permitted this case to go to the jury for its determination of whether the defendant was guilty of first-degree murder *only under the felony murder theory*, no instruction on lesser homicide offenses would have been proper. I concur only in the result reached by the majority.

Justice WEBB joins in this concurring opinion.